**GULF & WESTERN INDUSTRIES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 384–77.**

United States Claims Court.

Nov. 28, 1984.

Thomas E. Harrison, Jr., New York City, for plaintiff.

R. Anthony McCann, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION ON REMAND OF WUNDER-LICH ACT CASE FOR TRIAL *DE NOVO* BASED ON THE ADMINIS-TRATIVE RECORD

REGINALD W. GIBSON, Judge.

This case *initially* came before the predecessor U.S. Court of Claims on a petition, filed July 15, 1977, that subsequently was amended by the addition of Count 11, on April 17, 1979 for a Wunderlich Act review of the Armed Services Board of Contract Appeals decision, ASBCA No. 22204, 79–1 BCA ¶ 13,706 (January 31, 1979).[1] In that Board decision, the govern-

---

1. In its initial petition in the predecessor court filed on July 15, 1977, plaintiff's basis for relief was averred in ten counts and premised on breach of contract. Thereafter, on September 7, 1977, the parties moved for a stay of the then Court of Claims proceedings, pending comple-

tion of the proceedings before the ASBCA, as filed on July 6, 1977. On April 3, 1979, plaintiff moved to proceed on Count 11, Plaintiff's First Amendment to Petition (Wunderlich Act review of the ASBCA decision dated January 31, 1979), with the initial ten counts remaining stayed

ment's plea *in bar* to plaintiff's claims (magnetic particles inspection and defective specifications) for an equitable adjustment under the Changes clause of its supply contract was denied, in part, and granted, in part, respectively. Thereafter, on December 17, 1980, the predecessor U.S. Court of Claims, in a *per curiam* opinion, affirmed the trial judge's recommended decision in which finality was granted to the January 31, 1979 ASBCA determination because it was supported by substantial evidence. 226 Ct.Cl. 159, 639 F.2d 732.

Following the foregoing, the plaintiff, on June 1, 1981, filed a Motion For Relief From Judgment. The genesis of plaintiff's motion stemmed from certain alleged misconduct by the administrative law judge, who decided subject case (ASBCA No. 22204, January 31, 1979) as well as a separate companion case (ASBCA No. 21090, January 23, 1980). In that motion, plaintiff asserted that the administrative law judge had:

> ... contact[ed] counsel for the defendant, emphasizing that he had "more than an academic interest" in the outcome of a copending Court of Claims appeal involving plaintiff on virtually identical subject matter and ... offer[ed] to assist defendant's counsel relative to that appeal to insure that plaintiff's appeal would not be sustained.

Because of said alleged conduct by the presiding administrative law judge, Plaintiff's Motion For Relief From Judgment also averred that "[h]is conduct, at the very

least, gives the appearance of bias and prejudice, which, in view of the outcome of this case, has denied plaintiff due process in having its case decided by an impartial decisionmaker." Plaintiff further argued that "the decision rendered by [the administrative law judge] was arbitrary and capricious and therefore should not be entitled to the finality accorded an administrative agency's decision under the Wunderlich Act." The Court of Claims opinion acknowledged that there was an "... appearance of potential bias and prejudice," thus arbitrariness and capriciousness, in the copending case and for those reasons ruled, on August 4, 1981, as follows:

> ... plaintiff's motion is granted to the extent that the judgment of the court, dated December 17, 1980, is vacated. The case is remanded to the trial division of this court for a *de novo* determination and report by a trial judge, based on a preponderance of the evidence in the existing administrative record.[2] 655 F.2d 1106.

Jurisdiction is therefore premised on Title 28 U.S.C. § 1491, and Title 41 U.S.C. §§ 321 and 322.

### Scope of the De Novo Determination

On remand, the *de novo* review with which this court is charged to undertake is procedural and not substantive. This is so because the ASBCA decision only considered the defendant's affirmative defense in bar. This defense was grounded on the

---

until final resolution of Count 11. In response to plaintiff's petition for a Wunderlich Act review, the defendant filed a motion for partial summary judgment to affirm the ASBCA decision, to which the plaintiff filed a cross-motion for partial summary judgment, requesting that finality not be given to the ASBCA decision with respect to its defective specification claim.

**2.** Upon the reorganization of the predecessor U.S. Court of Claims, pursuant to the Federal Courts Improvement Act of 1982, Public Law 97–164, subject case was assigned to this court in accordance with the "pending cases" provision of Title 28 U.S.C. § 171 note (1982). That section provides that "[a]ny matter pending before a commissioner of the United States Court of Claims on the effective date of this Act ...

shall be determined by the United States Claims Court." The remand directive for a *de novo* determination of the factual findings, based on the existing administrative record, therefore, is not at variance with the limited scope of review pursuant to the Wunderlich Act (41 U.S.C. § 321), which provides, *inter alia,* that:

> ... any such decision shall be final and conclusive *unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith,* or is not supported by substantial evidence. (Emphasis added.)

Section 322, Title 41 U.S.C., contemplates that questions of law, as determined by a Board, are not entitled to finality and this court is thus not bound thereby.

premise that plaintiff's equitable adjustment claims were not asserted at any time *prior* to "final payment" under the contract and therefore, plaintiff was not entitled to a trial on the merits under the Changes clause of the contract. The ASBCA's decision of January 31, 1979 denied defendant's plea in bar as to the Magnetic Particles Inspection (MPI) claim and allowed its plea in bar regarding the defective specification claim.

The initial review in the predecessor court, therefore, embraced only the procedural issue of whether substantial evidence existed to establish that plaintiff's claims were asserted, as required, prior to "final payment" under the Changes clause. On the other hand, the remand decision of the Court of Claims, in effect, nullified its earlier affirmance as well as the ASBCA decision. This court will, therefore, pass on said procedural issue, *ab initio*, but will be limited to the administrative record.

Based on the factual findings, applicable law, and the reasons hereinafter delineated, this court concludes that *both* of plaintiff's equitable adjustment claims (MPI and defective specification) were asserted and made known to the contracting officer *prior* to "final payment" under the contract in question. Moreover, we find that plaintiff's defective specification claim should not be barred on the ground of prejudice to the defendant.

## De Novo Findings of Fact

Following the remand by the predecessor U.S. Court of Claims on August 4, 1981, the then trial judge requested and received proposed findings of fact and briefs from the respective parties. New evidence was neither requested, offered, nor received, and the findings proposed by the respective parties were premised on the evidence *in* the administrative record. The *de novo* factual findings of this court, *infra*, consist, therefore, of the proposed factual findings with respect to which the parties mutually agree, as well as those independently found by the court, all of which emanate from the "existing administrative record." Said inclusive factual findings are in part appended hereto in Appendix A and are also found elsewhere in this opinion. A brief overview of the operative facts follows as is appropriate for an understanding of the issues presented. In the Discussion section, *infra*, references will be made to definitive facts set forth in the Appendix as the exigencies of the circumstances warrant.

## Overview of the Facts

This case stems from two interrelated claims to the extent that they arise out of the same contract for equitable adjustments based on alleged constructive changes under a fixed price supply contract for an allotment of projectile warheads. The initial claim is styled the Magnetic Particles Inspection claim (MPI),[3] and the second claim, consisting of multiple assertions, is identified, for convenience, as the "defective specification claim." [4]

The Flinchbaugh Products Division of Gulf & Western Industries, Inc. was awarded, as a result of formal advertising by the Department of the Army, a firm fixed-price contract DAAA21–72–C–0048 (0048) on July 15, 1971. This contract required plaintiff to produce and deliver a quantity of 155mm projectile warheads

---

**3.** This claim avers that the defendant required plaintiff to perform MPI on the internal cavity surface of the warhead, although it was not required by the plain language of the contract. Thus, plaintiff alleges that fulfillment of said requirement constituted *extra work* not contemplated by the contract for which it is entitled to an adjustment.

**4.** The second claim asserts, *inter alia*, associated theories to the effect that the contract was impossible to perform due to the nature of the steel (HF–1) required to be used, and that the

defendant had superior knowledge of the unsuitability of said steel in the manufacturing of such warheads. Moreover, it is contended that the failure of defendant to impart the superior knowledge relative to the vagaries of the contract specification caused it to experience unanticipated difficulties in manufacturing the warheads because of the nature of the HF–1 steel. To that extent, it is contended that the specifications were defective and are the bases for the excessive scrap rate and extra work experienced by the plaintiff-contractor.

made from HF–1 steel manufactured by the Bethlehem Steel Company. Pursuant to this contract, plaintiff was obligated to produce 515 of such warheads (15 of which were to be First Article) at a unit price of $153.77 and a total initial contract price of $79,191.55.

Delivery of all of said units were required, on a partial basis, to commence in December 1971 and to be completed in February 1972. However, Modification No. P00001, amended the contract on January 27, 1972, requiring the contracted units to be delivered over the period between February 1972 and May 1972. This amendment was attributed to the slippage encountered by plaintiff in meeting the initial delivery schedule in view of the unanticipated manufacturing difficulties experienced in utilizing HF–1 steel and the requirement for MPI on the internal cavity of the warheads.[5]

By reference, the general provisions of contract 0048 contained the standard Changes clause (32 C.F.R. § 7.103–2) which provided, in pertinent part, that:

> Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change, provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim *asserted at any time prior to final payment under this contract.* (Emphasis added.)

Because of continued slippages in meeting the modified delivery schedule, defendant, on April 25, 1972, issued a "show cause" letter to plaintiff inviting it to establish why said contract should not be terminated for default. On or about the same date (April 25 and 26, 1972), plaintiff memorialized its position in two telegrams to the defendant with respect to the MPI issue. Therein, plaintiff summarized the defendant's previous verbalized position

that subject warheads will not be accepted by the government unless they pass the MPI tests of the internal cavity. Plaintiff emphasized that it read contract 0048 as *not* requiring MPI of the internal surface of each warhead. Undoubtedly, these communications crossed in their transmission, and on May 8, 1972, plaintiff was informed by defendant (the contracting officer), in response, that it considered MPI of "100% of all accessible areas of the Warhead as a contractual obligation."

In a letter dated May 9, 1972, plaintiff responded to defendant's "show cause" letter, *supra,* wherein it undertook to justify the slippage in meeting the delivery schedule as being directly attributable to reasons beyond its control and "not contemplated by Flinchbaugh Products at the time of contract award." The plaintiff explained that, as a result of the MPI requirement subsequently imposed by defendant and manufacturing difficulties emanating from defective specifications, it had to destroy 74 warheads and expend considerable engineering and management time to comply with the government's mandated specifications.

Defendant's position, expressed in its letter of May 8, 1972, was reaffirmed at a meeting between the parties on May 17, 1972. Substantially concomitantly therewith, on May 18, 1972, plaintiff forwarded a letter to defendant stating, *inter alia,* that it was incorporating MPI of the internal cavity surface of each warhead as a condition for government acceptance of the warheads. Additionally, it considered both defendant's letter of May 8, 1972, and its May 17, 1972 instructions to impose on plaintiff-contractor a constructive change under the Changes clause of the contract entitling it to an equitable adjustment of the contract price and the delivery schedule.

Thereafter, between May 27, 1972 and August 25, 1972, plaintiff made eight sepa-

---

**5.** The manufacturing difficulties experienced in meeting the defendant's specifications were also alleged to consist of numerous stops and starts occasioned by the unanticipated rejection rate caused by the cracking of an excessively large number of warheads and the inability of plaintiff to consistently meet the mechanical property requirements.

rate shipments of the projectile warheads which resulted in an aggregate of 437 projectile units shipped. At that posture, based on the initial contract requirements of 515 units, 78 units remained to be shipped. Payment for the units shipped were also invoiced and made on a segmented basis. As of October 10, 1972, *five* separate payments[6] had been made to plaintiff, for the total 437 units shipped, in the aggregate amount of $67,197.49 (437 × $153.77).

Subsequent to the May 18, 1972 MPI claim assertion, and during the production period of the warheads, plaintiff was required to periodically file Production Progress Reports (DD Form 375). In such reports, filed for each of the months of June and July of 1972, plaintiff reiterated various unanticipated and unexpected manufacturing problems aside from the MPI problem. These problems were identified as relating to the "development of heat treat process and verification of that process." The problems, identified as delays, arose out of shortages of a sufficient quantity of forging to replace those scrapped in developing and verifying the process.

On October 10, 1972, defendant issued check # 346–559, payable to plaintiff, in the amount of $8,918.66. This check represented the *5th partial* (erroneously identified as the "6th") *payment* under the contract. The court finds that said check was a *partial* and *not* a *final* payment as of October 10, 1972, because, on said date, plaintiff was then obligated to deliver the 78 remaining units of the total 515 units required under the contract, and for such would be entitled to $11,994.06 (78 units × $153.77). Plaintiff received and endorsed said check on or about October 19, 1972.

However, on October 12, 1972, plaintiff and defendant executed Modification No. P00003, effective retroactively to September 27, 1972, by which it was agreed, for the convenience of the defendant, that contract 0048 was partially terminated only with respect to the requirement of plaintiff delivering the remaining 78 contracted for warheads and defendant paying $11,994.06 therefor (78 × $153.77). In connection therewith, the court finds that the parties waived all claims and rights with respect to the *terminated* portion of the contract, but no rights were waived respecting pre-existing rights under the *non*-terminated portion of the contract, including, but not limited to, the MPI claim.

Because of Modification No. P00003, as of October 12, 1972, no additional payment was due plaintiff only with respect to the *initially* contracted amount ($79,191.55) because the items terminated (78 units × $153.77) represented the exact initial obligations remaining on the parties respectively. Thus, the 5th *partial* payment dated October 10, 1972 in the amount of $8,918.66 became, retroactively, the *last payment made*, but not the "final payment" under the contract, with respect to the 58 units shipped, under the modified contract respecting the initially contracted amount. (See Appendix B attached.)

Finally, DD Form 250, Material Inspection and Receiving Report, is the form executed by the plaintiff-contractor to control deliveries (shipment) of goods. Appropriately, ASPR Appendix I requires the contractor to suffix a "Z" following the shipment number to denote final shipment. When the eighth shipment was made on August 25, 1972 and DD Form 250 was executed by plaintiff, the shipment number was not "Z'd" out. This was appropriate because, on said date, 78 units remained to be shipped for which defendant would owe $11,994.06.

The foregoing facts would therefore warrant plaintiff to understand *after* October

---

**6.** While the advice of payment of October 2, 1972, in the amount of $8,918.66 was in fact the *fifth partial* payment, it was erroneously identified as the "6th partial." The voucher also initially characterized the payment as "partial" in the payment code column by the code number "2". It also contained a payment code "1" which indicates "complete or final" which was *not* included in the payment code column. On January 8, 1973, an inter-office memorandum purported to correct the payment voucher from "partial" to "final," but plaintiff was not notified of the change.

12, 1972, (i) that no more units were required to be shipped under the contract as modified; (ii) that it had been paid only the *contracted* unit price in full (received on October 19, 1972) for the 437 units shipped; (iii) that it then had a viable asserted May 18, 1972 MPI claim outstanding that had not been resolved (and still has not been resolved as of the date of this opinion); and (iv) that therefore said contract remained open and executory. We further find, pertinent to the foregoing, that plaintiff at no time executed a release to the benefit of defendant relative to the *un* terminated portion of the contract. Thus, plaintiff could reasonably at all times believe that "final payment" under the contract had not been made because it had not been compensated for its MPI claim.

In view of the foregoing, on June 7, 1977, plaintiff formally filed with the contracting officer the MPI claim, previously asserted in its letter of May 18, 1972, and in addition its "defective specification" claim. The contracting officer declined to consider either claim on the merits and advised the plaintiff on June 23, 1977, that inasmuch as final payment was accepted on October 19, 1972, he "consider[ed] the contract closed." As previously stated, in the appeal to the ASBCA on July 6, 1977, the defendant's plea in bar was allowed, with respect to the defective specification claim, and denied, with respect to the MPI claim on January 31, 1979. On December 17, 1980, the Court of Claims, in a Wunderlich Act review gave the Board decision finality. On plaintiff's Motion for Relief from Judgment of June 1, 1981, the court vacated said judgment and remanded the case for a *de novo* determination based on a preponderance of the evidence in the existing administrative record.

7. The court notes that the defendant had previously argued, before the Board, that the plaintiff had abandoned its MPI claim because it failed to *formally* assert that claim until June 6, 1977. However, because this argument was last asserted in the defendant's post-hearing brief on March 10, 1978, the court finds that this argument is no longer pursued. Nonetheless, even if said argument were still being proffered, the court concludes that the plaintiff's conduct dur-

## DISCUSSION

There is no litigable issue before this court as to whether the plaintiff's MPI claim was asserted timely within the period prescribed by the Changes clause. The defendant concedes, through its counsel and the testimony of its contracting officer, that an efficacious MPI claim is outstanding that needs to be decided on the merits. (See Tr. p. 6 of March 17, 1983 hearing, and Finding of Fact (FF) 8.) [7] Clearly then, as of May 18, 1972, the plaintiff duly asserted to the contracting officer that it was entitled to an equitable adjustment under the Changes clause due to a constructive change (FF 7). It is also evident that on or about October 19, 1972, the plaintiff received and accepted payment (hereinafter referred to as the "contract balance payment") for its last invoiced shipment, and that this payment when added to all prior payments received by the plaintiff equalled the total contract price ($67,197.49), as modified on October 12, 1972. (See FFs 17, 20.) However, this court further finds that said October 19, 1972 payment did *not* embrace any amount allegedly due under the Changes clause premised on an equitable adjustment and grounded on a constructive change.

In view of the foregoing, the issues presented before this court, on remand, are three-fold, all of which we answer in the negative:

1. Did the plaintiff sufficiently assert an informal defective specification claim to the contracting officer *prior* to October 19, 1972, the date the plaintiff received payment for the *balance* of the *contract price?*

2. Was the contract balance payment (of October 19, 1972) the "final payment"

ing the time span between May 18, 1972 and June 19, 1977, was not inconsistent with the continued assertion of its MPI claim. See FF 29. Therefore, the defendant has failed to meet its burden of proving that the MPI claim has been affirmatively abandoned. See *Quality Maintenance Co.,* ASBCA No. 19672, 75–2 BCA ¶ 11,465 (lapse of time is not, in itself, an act of abandonment).

under the contract, as that term is used in the Changes clause despite the pendency of the MPI claim?

3. If the outstanding MPI claim tolls the contract balance payment from becoming the "final payment" under the contract, should the defective specification claim be barred on the basis of prejudice to the defendant?

*Assertion of the Defective Specification Claim*

The plaintiff contends that its letter to the contracting officer dated May 9, 1972 and its DD Forms 375 for June and July 1972 when considered with the totality of the evidence were sufficient to charge the contracting officer with knowledge that plaintiff was asserting a legal right to additional moneys under the contract based on defective specifications.[8] Additionally, the plaintiff argues that the contracting officer's knowledge of the defective specification claim is further substantiated by his testimony at the Board hearing [February 1, 1978] in which he stated he was aware that the plaintiff was encountering production problems in performing the contract. (See FF 5.) Also, the plaintiff cites to the contracting officer's testimony relating to a memorandum that he prepared on November 15, 1974, in which it is stated that plaintiff "has had many problems using HF–1 steel." This testimony also observed that a subordinate of the contracting officer had classified the subject contract, 0048, as a research and development (R & D) contract and that the contracting officer's memorandum acknowledged that plaintiff had submitted a substantial claim against the government under an R & D contract and had verbally indicated to him that another claim would be submitted to him in the near future.

The defendant counters with the argument that the May 9, 1972 letter and the DD Forms 375 only contain ambiguous and oblique references to extensive efforts not contemplated by the contract and to unan-ticipated manufacturing difficulties. The defendant also avers that these documents cannot reasonably be interpreted as asserting a claim for equitable relief under the contract as a matter of legal right, but rather leave the sole impression that plaintiff was simply excusing itself for delays in connection with its contract performance. Further, the defendant argues that the contracting officer's testimony, later in the transcript, shows that the R & D contract to which the contracting officer referred in his memorandum was not related to the contract in suit, but rather to some other contract not even subject to his administration.

■ We begin our analysis respecting the first issue by pointing out that the Changes clause, contained in the subject contract (see FF 2), has been judicially interpreted to contain a time limitation within which "a contractor must assert his claims —30 days for actual changes, a reasonable period of time for constructive changes and in any event no later than the date of 'final payment'." *Jo-Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 156–57, 535 F.2d 62, 66 (1976). "In the constructive change situation, notice of the claim need not be presented 'within the specific number of days allowed' by the Changes clause, but 'the filing of a claim within the period of administration of the contract' is plainly a requisite." *Id.* When the government raises, as an affirmative defense, that the contractor failed to assert its claim prior to "final payment," the government bears the burden of proving such defense. *Cf. Scherr & McDermott, Inc. v. United States*, 175 Ct.Cl. 440, 448, 360 F.2d 966, 970 (1966); RUSCC 8(c).

■ Additionally, this court recognizes that our predecessor Court of Claims has held that "... a claim registered pursuant to a Changes clause of a government contract need not specify that clause particularly as a basis for relief, but it must bear

---

**8.** This argument was raised in plaintiff's memorandum in response to defendant's motion for partial summary judgment and in support of plaintiff's cross-motion for partial summary judgment filed July 20, 1979.

some of the attributes of a claim itself, purporting to be in the nature of a claim as of legal right as opposed to a request for grace." *Speciality Assembling and Packing Company, Inc. v. United States*, 156 Ct.Cl. 252, 254–55, 298 F.2d 794, 796 (1962). Special words or formal means of communication are, however, not required to present a cognizable claim for additional compensation. *Jo-Bar Mfg. Corp. v. United States*, 210 Ct.Cl. 149, 157, 535 F.2d 62, 66 (1976). Nor is it necessary to describe the substance of the claim or the amount demanded. *Machinery Associates, Inc.*, ASBCA No. 14510, 72–2 BCA ¶ 9476 at 44,141. On the other hand, it is clear that the contractor must reasonably manifest to the government its present intention to seek recovery of money based on a claim of legal right under the contract. *Id.; Jo-Bar Mfg. Corp.*, 210 Ct.Cl. at 157, 535 F.2d at 66.

■ Although the contracting officer forthrightly testified that he was aware of performance problems respecting HF–1 steel, and the evidence is irrefutable to that effect, such awareness is not *ipso facto* tantamount to the assertion of an efficacious monetary claim against the government. *Viewlex, Inc.*, ASBCA No. 14003, 71–1 BCA ¶ 8902 at 41,367; *Elco Corporation*, ASBCA No. 12149, 70–2 BCA ¶ 8373. Plaintiff's letter of May 9, 1972, only notified the government that the plaintiff was encountering significant problems not contemplated at the time of the contract award, and further sought to persuade defendant that such facts were sufficient cause for it not to terminate the contract. Similarly, the "Remarks" column of plaintiff's Production Progress Reports (DD Form 375) for the months of June and July 1972 did no more than complain of unanticipated problems in the development of the heat treat process. (See FF 9). Exculpatory notices to the government, given primarily to prevent termination of the contract, that unexpected problems have arisen, do not elevate to the level of notification needed to be conveyed to the government that additional funds, beyond the initial contract price, are demanded because of a construc-

tive change under the contract. *Viewlex, Inc.*, ASBCA No. 14003, 71–1 BCA ¶ 8902 at 41,367; *Elco Corporation*, ASBCA No. 12149, 70–2 BCA ¶ 8373; *Cf. Specialty Assembling & Packing v. United States*, 156 Ct.Cl. 252, 298 F.2d 794 (1962).

■ Moreover, it is apparent that the plaintiff here is a sophisticated government contractor who well knew exactly how to effectively assert a constructive claim under the Changes clause as exemplified by its letter of May 18, 1972, in which it notified the contracting officer of its magnetic particle inspection claim. (See FF 7.) Consequently, we find that the fact that the plaintiff failed to act consistently with regard to its defective specification problems is circumstantially probative that its indications of production problems were not intended as the assertion of a claim for additional money under the contract. Finally, the contracting officer's testimony regarding his internal memorandum of November 15, 1974, does not at all prove that a defective specification claim was posited prior to October 19, 1972. Taking all of the evidence into consideration, as of October 19, 1972, we find that the plaintiff's revelations bear more of the attributes of an attempt to explain a shortcoming rather than the assertion of a cognizable claim. The court concludes, therefore, that as of said date, plaintiff failed to assert a valid informal defective specification claim to the contracting officer or to his authorized representative(s).

*Final Payment*

While we reject plaintiff's contention that it asserted an effective informal defective specification claim *prior* to October 19, 1972, it is clear that it did file a *formal* MPI and defective specification claim on June 7, 1977. (FFs 30, 31.) Because the court finds that the informal MPI claim and not the alleged informal defective specification claim was effectively asserted prior to the contract balance payment date of October 19, 1972, the question now becomes whether that contract balance pay-

ment date was the "final payment" date under the contract so as to time bar the *formal* defective specification claim filed on June 7, 1977, even though the MPI claim remained to be resolved. The plaintiff contends that the outstanding informal MPI claim precludes final payment under the contract until it is finally resolved, and inasmuch as that claim is to date still pending, then, *a fortiori*, the June 7, 1977 formal assertion of its defective specification claim was timely.

The defendant vigorously counters with the argument that the payment received by the plaintiff on October 19, 1972, *i.e.*, the contract balance payment, was the "final payment" under the contract as that term is understood under the Changes clause, notwithstanding the unresolved MPI claim. Rather than tolling final payment, the defendant maintains that only the claim constructively asserted before the October 19, 1972 payment (*i.e.*, the MPI claim) was timely reserved to then be *formally* asserted after the occurrence of the final payment. The defendant, therefore, argues that the efficacious MPI claim cannot serve as a doorstop to final payment and thus hold the government vulnerable to additional claims until the MPI claim is resolved.

At the outset, it is important to observe that both parties have recited a line of cases to support their positions which, at first blush, in terms of dicta, appear to be conflicting. In this connection, the plaintiff cites to the Armed Services Board of Contract Appeals (ASBCA) decisions that have stated that:

This Board has held consistently that *"final payment" cannot be regarded as having occurred*, notwithstanding the making of a payment deemed by the government to be the last payment, when the contracting officer is aware or should reasonably know, that the payee is asserting a legal right to additional moneys. (Emphasis added.)

*Aerodex, Inc.*, ASBCA No. 7121, 1962 BCA ¶ 3492 at 17,820; *see also Lansdale Tube Co.*, ASBCA No. 5837, 61–2 BCA ¶ 3105, on motion for reconsideration, 61–2 BCA ¶ 3620 at 16,877; *Leader Mfg. Co.*, ASBCA No. 4416, 58–2 BCA ¶ 1877; *Onsrud Machine Works, Inc.*, ASBCA No. 14800, 71–2 BCA ¶ 9013; *Progressive Metal Equipment*, ASBCA No. 15954, 72–1 BCA ¶ 9301; *Shore-Calnevar, Inc.*, ASBCA No. 15715, 73–1 BCA ¶ 9837; *Whittaker Corporation*, ASBCA No. 17730, 75–1 BCA ¶ 11,179; other boards in accord: *Erie Controls, Inc.*, IBCA No. 350, 1963 BCA ¶ 3924; *Historical Services, Inc.*, DOT CAB Nos. 72–8, 72–8A, 72–2 BCA ¶ 9592; *Wilcox Electric, Inc.*, DOT CAB No. 73–14, 74–2 BCA ¶ 10,725. In contrast, the defendant cites to cases which enunciate the premise that:

Where the contracting officer knows, or is properly chargeable with knowledge, that *at the time of final payment* the contractor is asserting a right to additional compensation, even though formal claim therefor has not been filed, *the fact of final payment* does not bar consideration of a later formal claim. (Emphasis added.)

*Jo-Bar Mfg. Corp.*, 210 Ct.Cl. at 157, 535 F.2d at 66; *see also Discon Corporation*, ASBCA No. 15981, 71–2 BCA ¶ 9069; *Machinery Associates, Inc.*, ASBCA No. 14510, 72–2 BCA 9476; *Viewlex, Inc.*, ASBCA No. 14003, 71–1 BCA ¶ 8902; *Sam Mirman, Inc.*, ASBCA No. 22255, 78–1 BCA ¶ 13,061. Additionally, the defendant relies on *Machinery Associates*, ASBCA No. 14510, 72–2 BCA ¶ 9476 at 44,140, as defining "final payment" in which it was stated that:

By its check of 31 May 1968 which was cashed on 4 June 1968 the Government intended to make final payment to appellant. This payment was made after the machine had been accepted, a DD–250 had been issued, and after appellant had submitted an invoice to DCASR, Cleveland, which specifically noted acceptance had occurred and requested the "balance due on the above contract." The last payment was the second partial payment, the first partial payment having been made in 1967 after the machine was shipped to AMCOT. *It was made in the normal course of events following deliv-*

*ery, acceptance and the submission of an invoice requesting payment. This payment was the final payment as that term is used in the Changes clause.* (Emphasis added.)

Premised essentially on the above-cited language in *Jo-Bar* and *Machinery Associates, Inc., supra,* the government maintains that "final payment" occurred, in the case at bar, when the last invoiced payment was received on October 19, 1972, and because the defective specification claim was not asserted constructively or formally before that date, it was time barred.

■ While the definition espoused in *Machinery Associates, Inc.,* that final payment is that payment made pursuant to the unilateral intent of the government in the "normal course of events following delivery, acceptance and the submission of an invoice requesting payment [of the contract balance due]," reflects significant indicia of "final payment," as contemplated under the Changes clause, the court does not believe that such pronouncement logically and reasonably delineates a universal definition of that term that should be applicable in all cases, without regard to the particular circumstances of each case. Given the fact that therein the Board passed on the merits of several informal claims asserted *after* the last contract balance payment, it is not altogether clear that said Board actually applied the same definition of "final payment" in that case that defendant seeks to suggest was done, and should be done in the case at bar.[9] However one might interpret the definition of "final payment" in *Machinery Associates, Inc.,* this court rejects it if it can be read to mean that a duly asserted and unresolved informal claim made prior to the contract balance payment does not keep the contract open and does not preclude "final pay-

ment" as envisioned under the Changes clause.

Our view is that it makes more sense to interpret that phrase on the basis of the particular circumstances of each case, thereby focusing heavily on logic and reason and whether such payment, *i.e.,* "final payment," comes at a sequence in time and events consistent with finality. On the basis of the foregoing, for example, if a timely and duly asserted informal claim is transmitted to the contracting officer *prior* to the contract balance payment, then it logically follows that sequentially that payment cannot be the "final payment" under the contract because the contract remains open, and assuming arguendo the contractor's claim to be meritorious, future funds will, of course, be dispensed to the contractor *after* the contract balance payment date in satisfaction thereof. Thus, it is the latter payment that should logically and reasonably be characterized as the "final payment".

In such a situation, which exists here with regard to plaintiff's MPI claim, the court agrees with the rationale of *Historical Services, Inc.,* DOT CAB Nos. 72–8, 72–8A, 72–2 BCA ¶ 9592 at 44,838, wherein it is stated that:

Even if the Government thinks it has made the final payment and even if there are clerical entries labeling a payment as a "final payment," *there can be no final payment,* within the meaning of the Changes clause, *where the Contracting Officer knows or* should know *that the contractor is asserting a legal right to additional moneys under the contract. When timely notice of a claim has been given to a Contracting Officer, no matter how informal the notice, and when that claim is outstanding, "final payment" cannot be deemed to have occurred despite the fact that the total*

---

9. It appears to this court that the *end results* in *Machinery Associates, Inc.* are neither consistent with the apparent definition of "final payment" as there espoused, nor inconsistent with the holdings in *Onsrud Machine Works, Inc., supra,* and *Progressive Metal Equipment, Inc., supra,* inasmuch as in *Machinery Associates, Inc.* the

ASBCA considered on the merits a litany of informal *claims* asserted *after* the contract balance payment was made (May 31, 1968) where an informal government furnished bomb claim was duly asserted in December 1966, *i.e.,* prior to such payment.

*price stated in the contract has already been paid to the contractor.* (Emphasis added.)

*See also Whittaker Corporation,* ASBCA No. 17730, 75–1 BCA ¶ 11,179; *Shore-Calnevar, Inc.,* ASBCA No. 15715, 73–1 BCA ¶ 9837; *Onsrud Machine Works, Inc.,* ASBCA No. 14800, 71–2 BCA ¶ 9013; *Progressive Metal Equipment, Inc.,* ASBCA No. 15954, 72–1 BCA ¶ 9301; *Aerodex, Inc.,* ASBCA No. 7121, 1962 BCA ¶ 3492; *Lansdale Tube Co.,* ASBCA No. 5837, 61–2 BCA ¶ 3105, on motion for reconsideration, 61–2 BCA ¶ 3260; *Leader Mfg. Co.,* ASBCA No. 4416, 58–2 BCA ¶ 1877; *Erie Controls, Inc.,* IBCA No. 350, 1963 BCA ¶ 3924.

Rather than adopt a restrictive approach in defining the term "final payment," this court is persuaded by the reasoning in *Wilcox Electric, Inc.,* DOT CAB No. 73–14, 74–2 BCA ¶ 10,725, at 51,009, wherein it was stated that:

> ... the question of what constitutes a "final payment," while deceptively simple on its face, is not always easy to determine and may differ depending upon the totality of facts and circumstances of a particular case. If the payment in question is labeled "final" and *if such payment comes at a sequence in time and events consistent with finality ..., [then] those facts are strong indicia of "final payment."* (Emphasis added.)

In *Wilcox, supra,* a payment had been made that totalled to the contracted price, as did the contract balance payment in the instant case. The Board, however, in *Wilcox* concluded that this payment was not the final payment and stated that:

> No single factor ... in and of itself, would necessarily impel a finding of no "final payment." However, *all the factors taken together*—lack of any notation or indication of finality on the invoice or last check; execution of Modification 36 after issuance of the check and the still pending deductive equitable adjustment under the modification; failure to request a release; and the Govern-

ment's in-house treatment of the contract as being open and incomplete—*lead us to conclude that the October 29, 1971 invoice and check [the contract balance payment] did not constitute "final payment"* within the meaning of the standard Changes clause. (Emphasis added.) 74–2 BCA ¶ 10,725 at 51,011.

■ Similarly, the facts in the case at bar, taken together, do not logically indicate that the October 19, 1972 contract balance payment was the "final payment" under the contract. Particularly, whereas here, the advice of payment prepared by the government's finance office on October 2, 1972 was designated as *partial* rather than final (see FF 15); subvoucher No. A106–24 prepared October 4, 1972, also indicated a partial rather than final payment (FF 16); on October 10, 1972, a Treasury check was issued without any designation as to partial or final payment (FF 17); prior to October 12, 1972, there remained 78 warheads to be shipped at a price of $11,-994.06; on October 12, 1972, obviously after the issuance of the Treasury check, the contract was modified, terminating the remaining 78 warheads and in effect causing the October 10, 1972 check to be payment for the facially-modified balance of the contract; plaintiff only waived claims against the defendant arising under the terminated portion of the contract (FF 20); upon the execution of Modification No. P00003, defendant neither requested nor obtained a release; and the October 10, 1972 voucher was not changed to read final, from partial, until January 12, 1973; however, that change was solely internal and was not brought to the plaintiff's attention.

In light of the foregoing facts and circumstances, and the additional fact that the timely MPI claim was asserted on May 18, 1972, which to date has not been resolved, the court concludes that the check issued on October 10, 1972 and received by the plaintiff on October 19, 1972 could not reasonably be conceived as the cut-off point and thus was not the "final payment" under contract 0048 for purposes of the Changes clause. Keeping in mind that the

essence of the "final payment" cut-off date is to ensure that timely claims are asserted within the life of a contract and to protect the government against stale claims, *Historical Services, Inc.*, DOT CAB No. 72–8, 72–8A, 72–2 BCA ¶ 9592 at 44,839, the evidence clearly demonstrates that the 0048 contract was very much alive between the plaintiff and the defendant after October 19, 1972, despite the receipt by plaintiff of the last payment for the balance of the units shipped under the contract. Thus, we believe that it would strain reason, on these facts, to hold that the payment received by plaintiff on October 19, 1972, was the "final payment" under the contract, whereas here such payment comes at a sequence in time and events inconsistent with a finding of finality.

In holding that "final payment" turns on the facts and circumstances of a given case, it is emphasized that neither this court nor its predecessor, the U.S. Court of Claims, has previously defined "final payment" under the Changes clause.[10] To the extent that *Jo-Bar Mfg. Corp.*, 210 Ct.Cl. at 157, 535 F.2d at 66, refers to "final payment," as quoted *supra*, contrary to what the defendant contends, this reference clearly does not define that phrase, but rather it simply *begs* the question. In short, we view said reference purely as dicta, and not holding, which does not bind this court. We also note that in *Jo-Bar* the dispositive issue there was whether the plaintiff had *asserted a claim* for an equitable adjustment under the contract prior to final payment. Final payment was in fact made on March 16, 1973. Neither party disputed whether the last contract payment was the final payment and there were no other prior effective claims pending. A written claim was forwarded to the contracting officer on April 20, 1973. The definitive dispute in *Jo-Bar* centered only on whether plaintiff had asserted its claim prior to March 16, 1973, and it was held that it did not. Thus, there was no holding by the Court of Claims defining *when* final payment occurs.

Equally worth noting is the fact that in *Machinery Associates, Inc.* ASBCA No. 14510, 72–2 BCA ¶ 9476, the Board took jurisdiction on the merits over *all* of the contractor's informal claims even though the only claim that was found to have been constructively asserted *before* the final contract balance payment, which the Board held to be the "final payment," was in reference to government furnished bombs. *Id.* at 44,141. Finding that this constructive claim was timely asserted, the Board then considered post-final payment claims regarding defective specifications, changes and acceleration, and a hydraulic oil chilling unit. In fact, the Board in *Machinery Associates, Inc.* was not even sure appellant was claiming entitlement to an equitable adjustment under the Changes clause for supplying a higher tonnage hydraulic oil chilling unit. *Id.* at 44,144. Nevertheless, the Board considered the claim on the merits and disallowed it. In that case, at best, prior to final contract balance payment, the contracting officer was only aware of performance problems related to these other claims. Yet there, the Board considered all of the contractor's claims on the merits that arguably, for the most part, were *not* related to the timely government furnished bomb claim.

Essentially, the contracting officer's awareness of problems unrelated to the government furnished bomb claim in *Machinery Associates, Inc., supra*, is no different than the defendant's awareness in this case of problems with respect to the HF–1 steel. Given the results in that case, it is surprising, therefore, that the administrative law judge in his Board decision of subject case found comfort in the holding of *Machinery Associates, Inc.* sufficient to dictate the answer, in the negative, to the question: "Does the timely assertion of one constructive change claim have the effect of suspending the occurrence of final payment as that term is used in the Changes clause, so as to permit the later assertion of unrelated constructive changes claims?" *Gulf & Western Industries, Inc.*, ASBCA

10. We have found no such case nor has either party cited one to the court's attention.

No. 22204, 79–1 BCA ¶ 13,706 at 67,220. Premised on the *results* in *Machinery Associates, Inc.*, it is unclear to this court how that case can be helpful to the defendant on the facts here.

We have chosen a more realistic approach in defining final payment, and find that it makes more sense to hold that the totality of the sequential facts and circumstances should logically determine when final payment has occurred. Thus, the focus here, is not on whether the defective specification claim is directly related to the MPI claim, but rather, whether the defective specification claim was asserted, constructively or formally, before final payment under the contract was made. *See Erie Controls, Inc.*, IBCA No. 350, 1963 BCA ¶ 3924; *Historical Services, Inc.*, DOT CAB Nos. 72–8, 72–8A, 72–2 BCA ¶ 9592; *Kegelman Brothers*, ASBCA No. 19939, 77–1 BCA ¶ 12,276; *Onsrud Machine Works, Inc.*, ASBCA No. 14800, 71–2 BCA ¶ 9013; *Progressive Metal Equipment, Inc.*, ASBCA No. 15954, 72–1 BCA ¶ 9301; *Whittaker Corporation*, ASBCA No. 17730, 75–1 BCA ¶ 11,179; *Wilcox Electric Inc.*, DOT CAB No. 73–14, 74–2 BCA ¶ 10,725; *Shore-Calnevar, Inc.*, ASBCA No. 15715, 73–1 BCA ¶ 9837. Final payment should not be found as a matter of surprise. *Northrop Carolina, Inc.*, ASBCA No. 13958, 71–2 BCA ¶ 8970. Rather, it is the "payment which can reasonably and logically be considered the 'final payment' under the contract that marks [the] cut-off point for the contractor." *Historical Services, Inc.*, DOT CAB Nos. 72–8, 72–8A, 72–2 BCA ¶ 9592 at 44,839. Consequently, as detailed earlier, the facts and circumstances here, inescapably compel the conclusion that the contract balance payment of October 19, 1972, was *not* the "final payment" under the contract. Nor has final payment to date occurred. We find, therefore, that the defective specification claim, formally asserted on June 7, 1977, was presented prior to "final payment" under the contract.

*Prejudice*

Finally, the plaintiff contends that its defective specification claim should not be barred on the basis of prejudice (despite the over five year time lag) because "the Government for the bulk of the proceedings never alleged that it would be prejudiced in permitting plaintiff to be heard as to all of its claims. The Government never alleged prejudice (1) in its pleadings before the ASBCA; (2) at the February 1, 1978 hearing on the motion to dismiss; or (3) in its post-hearing briefs." (Pltf's Brief, April 22, 1982). Plaintiff further contends that "[t]he hearing in ASBCA No. 22204 on Defendant's Motion to Dismiss afforded defendant ample opportunity to present evidence of such prejudice. Defendant remained silent on this point." (Pltf's Memorandum, July 20, 1979).

Nonetheless, before this tribunal, the defendant argues that it "would have no ability to defend. The records [counsel is told] have been destroyed in the regular course of business and ... the memories of witnesses after this passage of time would be very unsure, at best...." (Tr. 33, March 17, 1983.)

■ The burden of proving prejudice resulting from the late submission of claims is on the government since there is no presumption of prejudice. *Chimera Corporation, Inc.*, ASBCA No. 18690, 76–1 BCA ¶ 11,901. In *Eggers & Higgins, et al. v. United States*, 185 Ct.Cl. 765, 785, 403 F.2d 225, 236 (1968), the Court of Claims, notwithstanding the fact that the administration of the contract was still open at the time a formal acceleration claim was asserted, upheld the Board's decision denying that claim on the basis of substantial prejudice to the government. The acceleration claim in *Eggers* was formally filed five and a half years after occurrence of the events upon which the claim was predicated. 185 Ct.Cl. at 773, 403 F.2d at 228. But, the court noted that the prejudice therein "was more than mere passage of time." 185 Ct.Cl. at 783, 403 F.2d at 235. At the hearing in *Eggers*, the contracting officer testified "that if he had been apprised in the early stages of the contract that an acceleration claim would be filed, he might

have taken a different course on extension of the contract completion time." He also testified "that the government could not evaluate plaintiff's claim in 1965, as adequately as in the latter part of 1959 or 1960, and gave as his reason that defendant could do nothing about the claim in 1965, whereas in 1959 it would have been possible to take other action ..." 185 Ct.Cl. 776–77, 403 F.2d at 231.

Unlike the substantial prejudice proved in *Eggers*, the administrative record, to which this court is bound, does not reflect any objective evidence of prejudice. In fact, it was not until *after* Trial Judge Bernhardt raised the issue of prejudice in his opinion that the defendant began to argue this point in its memoranda to the Court of Claims and this court. Without any definitive evidence of substantial prejudice, this court finds that the defendant has failed to meet the burden of proof required to bar consideration of the defective specification claim.

Additionally, the court agrees with the comments expressed in *Wilcox Electric, Inc.*, in which, addressing the government's complaints, the DOT CAB stated:

We are sympathetic to the Government's complaint about such delay and dilatory submission of a meaningful statement of the claim. On the other hand, the Government too has shown little diligence in closing out this contract, the deductive equitable adjustment under Modification No. 36 still not having been accomplished even at the time the appeal was filed with the Board.... We do think, however, it may be appropriate to take into consideration that delay on the part of the Government in evaluating the Government's assertion of untimeliness on the part of appellant.

DOT CAB No. 73–14, 74–2 BCA ¶ 10,725 at 51,013.

■ Likewise, the record here does not reveal any efforts by the government to resolve the MPI claim and thus expeditiously close out the contract. Nonetheless, the contractor's dilatory notice of its defective specification claim does increase its burden

of persuasion which rests upon it to offset whatever prejudice may have accrued towards the government. *Chimera Corporation, Inc.*, ASBCA No. 18690, 76–1 BCA ¶ 11,901 at 57,031; *Progressive Enterprises, Inc.*, ASBCA No. 17360, 73–2 BCA ¶ 10,065 at 47,210; *C.H. Leavell & Co.*, ASBCA No. 16099, 72–2 BCA ¶ 9694 at 45,270.

### CONCLUSION

Having found that plaintiff's MPI claim and defective specification claim were asserted prior to "final payment" under the contract, this court HEREBY ORDERS that defendant's motion for partial summary judgment is denied and plaintiff's cross-motion for partial summary judgment, therefore, is granted.

Pursuant to RUSCC 60.1(a), Count 11 of the First Amendment to Petition is hereby remanded to the Armed Services Board of Contract Appeals for a trial on the merits relative to plaintiff's MPI and defective specification claims. Such trial shall, of course, be held before a new administrative law judge. The proceedings in this court shall be stayed, therefore, for a period not to exceed six (6) months from the date the Clerk serves this order on the Board. Pending remand and a trial on the merits, plaintiff shall provide this court with a status report, every forty-five (45) days, commencing with the date of this order.

IT IS SO ORDERED.

### APPENDIX A

### FINDINGS OF FACT

1. On July 15, 1971, as a result of formal advertising by the Department of the Army, a firm fixed price contract DAAA21–72–C–0048 (contract 0048) was awarded to the Flinchbaugh Products Division of Gulf & Western Industries, Inc. (plaintiff) to supply a quantity of 155mm projectile warheads made from HF–1 steel at a unit price of $153.77 each. Pursuant to said contract, plaintiff was required to deliver 15 First Articles plus 500 production units of the warhead or a total of 515

units. The total contract price for 515 warheads was $79,191.55.

2. Contract 0048's general provisions included, by reference, the standard Changes Clause (32 C.F.R. § 7–103.2) which provided, in pertinent part:

Any claim by the Contractor for adjustment under this clause *must* be asserted within 30 days from the date of receipt by the Contractor of the notification of change, provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim *asserted at any time prior to final payment under this contract.* (Emphasis added.)

3. Contract 0048's general provisions also included, by reference, the standard Disputes Clause (32 C.F.R. § 7–103.12(a)) which provided:

(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

The duly authorized representatives of the Secretary has been and is the Armed Services Board of Contract Appeals ("ASBCA" or the "Board").

4. A disagreement between plaintiff and the Army concerning the Magnetic Particle Inspection (MPI) requirements was first described in two telegrams sent by the contractor to the contracting officer on April 25 and 26, 1972. Therein, the contractor acknowledged that the contracting officer advised that warheads under subject contract will not be accepted by the government unless they satisfactorily pass the MPI test of the inside surface. The plaintiff-contractor read the contract (0048) as not requiring MPI of the inside surface of the warhead. Nevertheless, by letter to plaintiff dated May 8, 1972, the contracting officer advised plaintiff that the defendant considered MPI of "100% of all accessible areas of the Warhead as a contractual obligation." The defendant's position on this matter was reasserted during a meeting between the parties on May 17, 1972.

5. During performance of contract 0048, plaintiff encountered production difficulties in manufacturing the warheads to government specifications and experienced numerous stops and starts and production delays. These difficulties included an unanticipated rejection rate because of cracking and an inability to consistently meet the mechanical property requirements imposed by the government. The contracting officer, during the performance of contract 0048, knew that plaintiff "was encountering production problems in performing this contract." (Tr. 84).

6. As a consequence, slippages encountered by the plaintiff-contractor in meeting the delivery schedule led defendant to issue a "show cause" letter on April 25, 1972. Plaintiff responded thereto by letter dated May 9, 1972, in which it maintained, *inter alia, that:*

Since award of contract Flinchbaugh Products has diligently pursued development of a heat treat process to achieve

specified mechanical properties. HF–1 steel is relatively new to the program and achievement of specified tensile and elongation properties was not guaranteeable by the inventor and producer of the steel, Bethlehem Steel Co. Accordingly, significant testing and evaluation has been necessary to develop achievable mechanical properties for this steel.... We have destroyed seventy four (74) warheads and expended considerable engineering and management time working toward the Governments [sic] objectives for HF–1 steel warheads. The extensive effort required to date was not contemplated by Flinchbaugh Products at the time of contract award.

7. By letter dated May 18, 1972, plaintiff stated, in responding to the contracting officer's letter dated May 8, 1972, in pertinent part:

This is to advise that we are proceeding under a plan to incorporate Magnetic Particle Inspection of the internal cavity surfaces as a prerequisite for Government acceptance of the Warhead. We consider both your letter of 8 May 1972 and instructions given at the 17 May 1972 meeting impose upon Flinchbaugh Products a constructive change under the "Changes" clause of the contract entitling us to an equitable adjustment of contract price and delivery schedule. Upon establishment of a mutually agreeable acceptance criteria for magnetic inspection of the Warhead inside surface we will advise you of the impact on price and delivery.

This letter notified the government that plaintiff would perform MPI under protest. However, plaintiff considered this requirement to be a constructive change under the Changes clause entitling it to an equitable adjustment of the contract price and delivery schedule. The contracting officer did not render a final decision, nor did he take any further action based on this letter.

8. On cross-examination during the ASBCA hearing on February 1, 1978, the contracting officer recanted his testimony on direct examination that plaintiff's May 18, 1972 letter did not assert a claim for an equitable adjustment for MPI under contract 0048 and twice admitted that he considered said letter to constitute "a claim." (*Cf.* Tr. 55, 69, 71.) Without regard to said admission, this court finds that plaintiff's May 18, 1972 letter manifested a present intention to seek recovery under a claim of right under contract 0048; and that it constituted the timely assertion of a claim relative to the internal magnetic particle inspection requirement.

9. Subsequent to the May 18, 1972 MPI claim assertion, plaintiff complained of "unanticipated" and "unexpected" problems aside from the MPI problem in the "remarks" column of its Production Progress Reports (DD Form 375) for the months of June and July, 1972, submitted to the Defense Contract Administration Service (DCAS). Under the same column, the contractor went on to state that:

This contract is the first production of the 155 mm RAP Warhead manufactured from a Heat Treated Forging Process. Since our own forging equipment was required for use on another warhead and the high tooling expense for such a comparatively small quantity, we subcontracted the basic forging.... In recognition of anticipated problems with a new process we ordered 715 forgings against a contract quantity of 515. We also encountered unanticipated problems in the development of heat treat process and verification of that process... We have had other unexpected delaying problems ... This results from the fact that we do not have a sufficient quantity of forgings to replace those scrapped or destroyed in developing and verifying the process.

Nothing in these reports either, *ipso facto,* or collectively, manifested to the contracting officer a present intention to seek recovery of money under a claim of right with respect to appellant's defective specification allegations.

10. At a meeting at plaintiff's plant on July 19, 1972, plaintiff advised defendant that it would perform internal magnetic

particle inspection on the warhead but that it considered this to be an additional contract requirement for which reimbursement was due. The contracting officer was advised of said statement by a Trip Report of John Rodzinka dated July 29, 1972. This Trip Report is additional documentary evidence that the contracting officer was then on notice that plaintiff expected to receive payment in excess of the contract price relative to the MPI issue.

11. Plaintiff's May 18, 1972 letter did not assert or mention a claim based on defective specifications, commercial impossibility or superior knowledge.

12. On May 27, 1972, plaintiff shipped the 15 first article warheads and commenced shipment of production units of the warhead.

13. In seven separate shipments, made between May 27 and July 28, 1972, plaintiff shipped to the Army a quantity of 379 warheads, including the 15 first articles. From Advices of Payment (DSA Form 477) prepared between July 3 and August 28, 1972, defendant made four partial payments to plaintiff in the total amount of $58,278.83. This amount is equal to the 379 units times the contract unit price ($153.77).

14. On August 25, 1972, plaintiff made its eighth shipment, No. FPI0008 under contract 0048, consisting of a quantity of 58 production units of the warhead. In box 23 of the Material Inspection and Receiving Report (DD Form 250), which the government encourages to also be used as an invoice for billing purposes, plaintiff inserted the figures "500"/422, signifying that a total of 422 out of 500 production units had been shipped to date and indicating that, after the date of shipment No. FPI0008, 78 production units remained to be delivered. The invoiced number of said document is shown in box # 6 as "32434", was stamped "invoice copy", and said invoiced amount was $8,918.66.

15. On October 2, 1972, the government's finance office in Philadelphia, Pennsylvania prepared Advice of Payment Form DSA 477 for payment of invoice No. 32434 dated August 25, 1972. In the type of payment section of the form, "6th *partial*" payment rather than *final* payment was designated. The entry of 6th partial was in error. Only a total of five payments were made under contract 0048, and check No. 346–559 was the fifth (Tr. 99).

16. On October 4, 1972, the government prepared its sub-voucher No. A106–24 for the payment of $8,918.66. Sub-vouchers used by the government for such payments have a column indicated with an asterisk (*) to designate the type of payment to be made. On sub-voucher No. A106–24 the number 2 was placed in the asterisk (*) column to designate the payment as being a *partial* payment, rather than the final payment.

17. On October 10, 1972, the government issued check No. 346–559 payable to Flinchbaugh in the amount of $8,918.66 for the 58 warheads shipped and invoiced on August 25, 1972. Upon issuance of said check, this was not the last payment then due under contract 0048. The check was received and accepted by plaintiff on or about October 19, 1972 (Tr. 28).

18. Check No. 346–559 was not marked as either partial or final payment. It was standard procedure for a Treasury check addressed to a contractor not to bear any markings designating it as a partial *or* final payment (Tr. 91). The marking as to the type of payment being made, *i.e.*, partial or final, would only be shown on DSA Form 477, the Advice of Payment, as previously described (Tr. 91). Defendant's finance office, in making a payment, would indicate on the DSA Form 477 that payment was final only if it were the last payment and the finance office had been notified that it was the last shipment (Tr. 95).

19. The $8,918.66 amount represented the payment which was invoiced to the government on August 25, 1972, at the contract unit price ($153.77) for the quantity of 58 warheads. When added to the four previous payments (Finding 13, *supra*), plaintiff was paid, as of the date of

the receipt of the check, a total of $67,-197.49 for delivery of 437 warheads, including first articles. After August 25, 1972, and prior to October 12, 1972, there remained to be shipped under the contract 78 warheads (Finding 14, *supra*), for which plaintiff would be entitled to $11,994.06.

20. On October 12, 1972, contract 0048 was *partially* terminated for defendant's convenience. The contracting officer at Picatinny, New Jersey, signed bilateral Modification No. P00003 effective 27 September 1972 to cause such termination. Under Modification No. P00003 shipment by plaintiff of the remaining quantity of 78 warheads at a unit price of $153.77 for such warheads was waived. This amounted to a total contract cost reduction of $11,994.06 (153.77 × 78 = $11,994.06). Under this modification plaintiff expressly agreed to waive any claims against defendant arising under the *terminated* portion of the contract (Tr. 27). Nothing in the modification could, however, be construed as waiving or relinquishing plaintiff's claims which pertained to or emanated out of the unterminated portion of contract 0048. Modification No. P00003 expressly stated that the "Contract price is decreased by $11,994.06 from $79,191.55 to $67,197.49." The termination for convenience effective September 27, 1972, did not waive any of plaintiff's claim(s) for equitable adjustment under the *non*-terminated portion of contract 0048.

21. However, upon the execution of Modification No. P00003, the check drawn on October 10, 1972 and received by plaintiff on October 19, 1972 in the amount of $8,918.66 for the 58 warheads retroactively became the last invoiced payment.

22. Subparagraph I–301 Block 2(c) of ASPR Appendix I, Material Inspection and Receiving Report (DD Forms 250, 250c, 250–1), in effect during the period of contract 0048, prescribed that the "prime contractor shall control deliveries and on the final shipment of the contract shall suffix the shipment number with a 'Z'." Pursuant to the foregoing requirement, on or about November 8, 1972, plaintiff submitted a *corrected* copy of the DD Form

250 prepared for its August 25, 1972 shipment of 58 warheads to identify this shipment as "FPI 0008*Z*", thus acknowledging this as the *final* shipment made under the contract.

23. The "Z" on Form DD 250 was "for the purpose of letting the people who the DD 250 is distributed to know that all line items are completed and that all products have been accepted and shipped" (Tr. 102).

24. There is no provision or requirement in the ASPR to note on the DD 250 the existence of claims (Tr. 105).

25. From the above we find that the entry of a suffix "Z" on the corrected form DD 250 is not determinative as to whether "final payment" has occurred under contract 0048 as contemplated by the Changes clause (Tr. 10).

26. By letter dated 8 January 1973, the DSA advised Picatinny Arsenal that the October 10,.1972 voucher was processed as "partial payment # 6" and it was requested that it be corrected to read "final" in lieu of "partial". A Contract Completion Statement Form (DD Form 1594) was then prepared by the contracting officer on January 12, 1973.

27. From the facts as set forth above, we find that after October 12, 1972, plaintiff understood that no further deliveries were required under the contract as modified. Nevertheless, plaintiff, by virtue of its outstanding MPI claim, fully and reasonably expected to receive an additional payment under contract 0048.

28. The pendency of the magnetic particle inspection claim logically and factually precluded any occurrence of "final payment" under contract 0048, as contemplated by the Changes clause, until that claim was resolved.

29. Following the assertion of the MPI claim on May 18, 1972, no discernible affirmative conduct of the plaintiff surfaced that reflects a definite unmistakable intent to abandon said claim. To the contrary, all affirmative conduct of plaintiff after May 18, 1972, up to and including the filing of the *formal* MPI (and defective specification) claim(s) on June 7, 1977, is consistent

with an intent to pursue said claim. Such evidence includes but is not limited to Ex. F (July 20, 1972); Ex. 1011 (DD Form 375 dated August 2, 1972); Contracting Officer's Memorandum (Vol. I) dated November 15, 1974; Ex. 1002, page B–5, dated April 10, 1975; Ex. 1012 dated June 18, 1975; as well as the formal claim filed on June 7, 1977.

30. Notwithstanding the existence of plaintiff's May 9, 1972 letter in response to the defendant's request to show cause why the contract should not be terminated, and the DD Forms 375 (June and July 1972) which merely identifies certain production problems, including the testimony of the contracting officer, nothing in the record warrants a finding that plaintiff manifested an assertion of a present intent to seek recovery for defective specifications prior to October 19, 1972.

31. It was, therefore, not until June 7, 1977, five years after the informal magnetic particle inspection claim was presented, that plaintiff, for the first time, made claim for defective specifications under contract 0048. By letter dated June 23, 1977, the contracting officer declined to consider either of plaintiff's claims on the merits, stating that final payment had been made and accepted by the contractor and that "we consider the contract closed." Plaintiff filed a timely notice of appeal from this letter. At the time plaintiff asserted its formal claim for defective specifications (superior knowledge, commercial impossibility and the imposition of an internal magnetic particle inspection requirement), plaintiff had already asserted a timely informal claim for magnetic particle inspection which has not been resolved to date.

APPENDIX B

Ex. 21 "Contract" 7/15/71:

| Number | Item | Quantity | Price | Amount |
|--------|------|----------|-------|--------|
| #0001 | Warhead #155MMRAP | 350 @ | $153.77 | $53,819.50 |
| #0001AA | 1st Article Warhead, Unpainted | 10 @ | 153.77 | 1,537.70 |
| #0001AB | 1st Article Warhead, Painted | 5 @ | 153.77 | 768.85 |
| #0002 | Warhead | 150 @ | 153.77 | 23,065.50 |
| #0003 | Contract data | | | NSP |
| | Contracted Amount | 515 | | $79,191.55 |
| Ex. 24 | Modification P00003[1] | (78)[2] | | (11,994.06) |
| | Adjusted Contracted Amount | 437 | | $67,197.49 |

---

[1] Ex. 24 – Amendment P00003 (10/12/72—eff. 9/27/72) 78 units terminated $11,994.06.

[2] Ex. 24 – Letter of 8/28/72 by plaintiff shows 78 units undelivered, and that plaintiff agrees to a reduction in quantity to be delivered by 78 units without cost to defendant. However, the definitive agreement with defendant was not executed until October 12, 1972.

| Ex. No. | Advice of Payment— Partial Payment | Material Receiving Report | Item No. | Qty. | Unit Price | Delivered | Partial Payment |
|---|---|---|---|---|---|---|---|
| 34 | 8/38/72 | — | — | — | — | — | $ 3,844.25 |
| 35 | — | 7/28/72 | 0002 | 14 | $153.77 | $ 2,152.77 | — |
| 36 | — | 7/28/72 | 0001 | 11 | 153.77 | 1,691.47 | — |
| 37 | 8/14/72 | — | — | — | — | — | 24,141.89 |
| 38 | — | 7/14/72 | 0001 | 157 | 153.77 | 24,142.89 | — |
| 39 | 7/27/72 | — | — | — | — | — | 11,378.98 |
| 40 | — | 6/20/72 | 0001 | 74 | 153.77 | 11,378.98 | — |
| 41 | 7/3/72 | — | — | — | — | — | 18,913.71 |
| 42 | — | 5/27/72 | 0001 | 10 | Replace defec- | | — |
| | — | — | 0002 | 5 | tive submissions | | — |
| 43 | — | 5/27/72 | 0001 | 52 | 153.77 | 7,996.04 | — |
| 44 | — | 5/31/72 | 0001 | 56 | 153.77 | 8,611.12 | — |
| 33/51* | — | 8/25/72 | 0002 | 58 | 153.77 | 8,918.66 | — |
| 53/32 | 10/10/72 | | | | | — | 8,918.66 |
| | 5̄ | 8̄ | | 437 | | $64,890.90 | $67,197.49 |

*(FPI0008Z).

