ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Trade West Construction, Inc. | ) | ASBCA No. 61068 |
| | ) | |
| Under Contract No. W912PM-15-C-0024 | ) | |

APPEARANCES FOR THE APPELLANT:  Karl Dix, Jr., Esq.
Lochlin B. Samples, Esq.
  Smith, Currie & Hancock LLP
  Atlanta, GA

APPEARANCES FOR THE GOVERNMENT:  Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
David C. Brasfield, Jr., Esq.
Carl E. Pruitt, Jr., Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Mobile

OPINION BY ADMINISTRATIVE JUDGE STINSON

Appellant Trade West Construction, Inc., (Trade West), appeals a contracting officer's denial of its October 21, 2016, claim, in the amount of $304,062, for shaping armor stone prior to placing it on top of an existing jetty. Trade West argues that the government wrongfully rejected the armor stone it wished to use, thereby forcing it to spend time and money shaping the armor stone to make it acceptable to the government. (R4, tab 3) We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties submitted cross-motions for summary judgment, reply briefs, and exhibits to be considered in deciding this appeal.[1] Appellant also submitted two affidavits. For the reasons stated below, the parties' cross-motions for summary judgment are denied.

---

[1] The government's motion for summary judgment and appellant's cross-motion for summary judgment/response to the government's motion are referred to herein as "gov't mot." and "app. mot." The government's response to appellant's cross-motion/reply in support of its own motion is referred to as "gov't resp." Appellant's reply in support of its motion for summary judgment is referred to as "app. reply."

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE
## PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

1.  On September 25, 2015, the United States Army Corp of Engineers (USACE), Wilmington District, awarded Trade West Contract No. W912PM-15-C-0024 (the Contract), in the amount of $3,294,362.00, for South Jetty repairs to the Masonboro, Inlet located in New Hanover County, North Carolina (R4, tab 4.1 at 126, 132-33). The Contract required placement of armor stone weighing of 14 to 22 tons on an existing jetty, insuring that the armor stone "form a compact mass and interlock with each other and the existing stones" (R4, tab 4.1 at 134, 298).

2.  The Contract included specifications for "Exterior Improvements," Section 32 05 00.38, entitled "Stone." Contained within that section was Part 1, "General," Part 2, "Products," and Part 3, "Execution." (R4, tab 4.1 at 293)

3.  Part 1.1, entitled "Scope," provided, "[t]he work under this section shall include all plant, labor, materials, work surface, and equipment required for the furnishing, transportation, storage, and placing of stone as shown on the drawings" (R4, tab 4.1 at 294).

4.  Part 2.1, entitled "Materials," provided, in part:

> 2.1.2 Armor Stone
>
> Stone shall consist of fresh, sound, hard, dense, durable, crystalline igneous or metamorphic rock which shall be separated from bedrock by quarrying. The stone shall be of such quality that the individual stone integrity and permanence within the jetty is assured under all conditions to which it is subjected.
>
> . . . .
>
> The stone shall be free from open or incipient cracks, joints, seams, fissures and structural planes of weakness which might contribute to spalling or breakdown from; handling and placing, freeze-thaw cycles, wet-dry cycles, or from wave action. The stone shall be furnished in blocky and angular shapes. Flat stones, tabular stones, slabs, boulders and parts of boulders will be rejected. No

2

stone will be permitted which has a longest dimension that is three times (3X) or greater, than its least dimension.

(R4, tab 4.1 at 296)

5. Part 2.1.3, entitled "Stone Size and Gradations," provided "[f]or the granite/granite gneiss armor stone, the specified weight range shall be 14.0 tons to 22.0 tons with 75% weighing more than 18.0 tons" (R4, tab 4.1 at 297).

6. Part 2.1.4, entitled "Stone Sources," provided:

> The source(s) from which the Contractor proposes to obtain stone materials as required for these specifications shall be selected and identified to the Contracting Officer or his/her designated representative within 15 days of receipt of Notice to Proceed. This source(s) shall be inspected by a Corps of Engineers Geologist. The stone source(s) shall provide test results of ASTM D5312/D5312M and ASTM D5313/D5313M and records of successful use on similar projects. The stone sampled by the Contractor shall be no less than 5 inches per side, excluding the thickness, and shall be tested by a Corps of Engineers validated commercial testing laboratory, or a Corps of Engineers laboratory. The tests shall include; bulk specific gravity, saturated surface dry (SSD) unit weight, absorption (all three tests as per ASTM C127), abrasion, wetting and drying (ASTM D5313/D5313M), and freeze-thaw (ASTM D5312/D5312M). The results of the testing shall be submitted to the Contracting Officer or his/her designated representative for review and approval at least 30 days prior to being shipped to the construction site.

(R4, tab 4.1 at 297)

7. Part 2.1.5, entitled "Stone Not Meeting The Specifications," provided, in part:

> If, during the progress of the work, it is found that the stone being furnished and/or placed by the Contractor does not meet all the requirements of the specifications, the Contractor shall furnish other stone of a quality acceptable to the Contracting Officer or his/her designated

3

representative. Any stone rejected at the site of work as not meeting the requirements of these specifications for quality, condition, size, or otherwise, shall be removed from the site by and at the expense of the Contractor. All stones which are broken during shipment to the work site or during placement shall be rejected. The Contractor shall dispose of all rejected stone in a manner that is approved by the Contracting Officer or his/her designated representative.

(R4, tab 4.1 at 297)

8. Part 3.2, entitled "Placement of Stone," provided, in part:

3.2.1 General

Care shall be taken to place the stone so that they will form a compact mass, and form as nearly as practicable a cross-section of the height, width, and slopes as shown on the contract drawings. All stones shall be carefully placed so as to form a compact mass and to minimize the voids between them. Special care shall be taken during placement of stone to avoid damaging the existing sheetpile wall.

(R4, tab 4.1 at 298)

9. Part 3.2.4, entitled "Armor Stone Placement," provided:

Armor stone shall be placed in a single layer to achieve the design cross sections and top elevation, as shown on the drawings. Begin placement of the stone at the toe of the placement limits and work upslope to reduce the risk of stone rolling and launching. Dropping of stones onto the structure is strictly prohibited. Each armor stone shall be lowered to rest before being released and shall be placed to the satisfaction of the Contracting Officer or his/her representative. All stones shall be carefully placed so as to minimize the size of voids between them. The armor stones of various sizes and shapes shall be distributed such

4

that they form a compact mass and interlock with each
other and the existing stones.

(R4, tab 4.1 at 298)

10.  Part 3.3, entitled "Quality Control," provided, in part:

3.3.1  General

The Contractor shall establish and maintain quality control
for the armor stone and all other operations in connection
therewith to assure compliance with contract requirements.
The Contractor shall inspect for compliance with contract
requirement and record the inspection of all operations,
including but not limited to the following:

a.  Armor stone complies with the specifications for quality
and weight and is placed to the lines and grades shown in
the drawings within allowable tolerances.

b.  All stone placed in a dense compact mass.

(R4, tab 4.1 at 298-99)

11.  Note 2 on Contract drawing CN101 stated, "[t]he intent of the project is to
provide one new layer of armor stone within the approximate armor stone placement
limits area shown.  The cross hatched areas shown are a general guide for stone
placement."  (Ex. A-8)[2]

12.  Note 4 on Contract drawing CN301 stated, in part:

Armor stone shall be placed to achieve the design cross
sections and top elevation, as shown on plates CN301 thru

---

[2] Appellant included a total of eight exhibits with its filings.  The five exhibits
included with its initial motion were labeled "TWC Exhibit A," through "TWC
Exhibit E."  The three exhibits included with its responsive motion were labeled
"EXA," through "EXC."  Where referenced in this decision, we refer to
appellant's eight exhibits sequentially as "ex. A-1" through, "ex. A-8"
beginning with the five exhibits included with its initial motion (which were
labeled TWC Exhibit A through E) and concluding with the three exhibits
included with its responsive motion (which were labeled EXA through EXC).

CN308. Stone shall be placed in a single layer within the horizontal and vertical limits shown . . . . Please note, the stones depicted on the typical cross sections, as well as the cross sections themselves, are merely general representations, and do not mandate the size of the stone to be utilized. They are only intended to be a general example of proper stone placement.

(Ex. A-8)

13. The Contract incorporated FAR 52.243-4, CHANGES (JUN 2007), stating, in part:

> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating
>
> (1) the date, circumstances, and source of the order and
>
> (2) that the Contractor regards the order as a change order.
>
> (c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the

6

Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after

(1) receipt of a written change order under paragraph (a) of this clause or

(2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

48 C.F.R. § 52.243-4; (R4, tab 4.1 at 218-19).

14. The September 25, 2015, cover letter congratulating Trade West on the award of the Contract, stated, in part:

It is emphasized that only a warranted Contracting Officer (either a Procuring Contracting Officer (PCO), or an Administrative Contracting Officer (ACO)), acting within their delegated limits, has the authority to issue modifications or otherwise change the terms and conditions of this contract. If an individual other than the Contracting Officer attempts to make changes to the terms and conditions of this contract you shall not proceed with the change and shall immediately notify the Contracting Officer.

(R4, tab 4.1 at 127)

15. Modification No. P00001 issued the Notice to Proceed, effective November 24, 2015, and established a Contract completion date of May 22, 2016 (R4, tabs 4.2 at 440-43).

16. On November 24, 2015, Andy Leavitt, Trade West's Project Superintendent, requested a site meeting with USACE geotechnical personnel at the Martin Marietta Fountain Quarry (Fountain Quarry) to view armor stone proposed for

7

use on the project (exs. G-1, A-1).[3] The parties met at Fountain Quarry, and, subsequently, on December 28, 2015, the government notified the contractor "that the rock submitted and inspected at the quarry is acceptable for use on the subject project" (ex. G-2). Appellant proposed no other supplier of armor stones other than Fountain Quarry, although appellant had communicated with other quarries about providing armor stone for the project (exs. G-18 to -22).

17. In February 2016, appellant made additional inquiries from quarries about supplying armor stone for the project (exs. G-23 to -24).

18. Appellant experienced a slow rate of production at Fountain Quarry, and, by email dated February 24, 2016, Trade West requested an on-site meeting with the government to consider armor stone from a second source. Trade West stated it would deliver stone samples to its staging area for the government to review and was gathering test reports for review, which would be forwarded to the government "once they have been found to meet all the specifications of the contract." (Ex. G-3) The parties held a telephone conference that same day, discussing Trade West's request (ex. G-4).

19. The parties met at the project site on February 26, 2016, to discuss the use of stone from Salisbury Quarry. In an email dated February 29, 2016, Rolando Serrano, the contracting officer's representative, expressed concerns arising from what was witnessed at that meeting:

> On Friday February 26, 2016 during our meeting between TWC and members of the Corps of Engineers at TWC's Stock Yard; it was observed that a rather large quantity of rock (flat faced) from the Salisbury quarry had been delivered to your yard for which our representatives have strong concerns about. I strongly suggest that TWC not continue delivery of rock from an un-approved source.

(Exs. G-4 to -5)

20. By Serial Letter TWC-0001, dated February 29, 2016, and addressed to Contracting Officer Charlene Figgins, Trade West's Quality Control Manager, Steven Potter, sought "to clarify Trade West Construction's interpretation of the contract specification pertaining to Armor Stone, and why we believe that the blocky and angular stone we are proposing to use meets the specification requirements as

---

[3] Where referenced in this decision, we refer to the 26 consecutively-numbered exhibits submitted by the government with its initial and responsive motion as "ex. G-1" through "ex. G-26."

outlined in the contract" (ex. G-7 at TWC004086). As support, Mr. Potter cited Contract specifications relating to both "Materials" (Part 2.1) and "Placement" (Part 3.2):

> Specification Section 32 05 00.38 STONE, paragraph 2.1.2 Armor Stone, states that "The stone shall be furnished in blocky and angular shapes." After extensive digging into what defines a stone as "blocky and angular" we found several credible sources, all of which have similar definitions. You can see all of the definitions we uncovered attached to this letter. We find that "blocky" is best defined as "resembling a block in form," and "angular" is best defined as "having one or more angles." Additionally, the USGS interprets "angular" at the granular level as being the "opposite of round." Further search into a definition where "blocky and angular" were used in conjunction with one another, typically turned up landscaping stones which closely resembled the blocky stones we are proposing to use, but on a much smaller scale.
>
> Specification Section 32 05 00.38 STONE, paragraph 3.2.4 Armor Stone Placement, states that "The armor stones of various sizes and shapes shall be distributed such that they form a compact mass and interlock with each other and the existing stones." I reference this segment of the specifications due to the verbiage pertaining to various size and shapes. The stone we are proposing to use consistently produces various sizes and shapes with no two stones holding the same dimensions, angles or shapes. On February 26, 2016, while the COE had representatives on-site, we measured several blocks and found that every sample produced its own unique dimensions.

(*Id.*) Trade West also cited a mockup presentation allegedly demonstrating the proposed Salisbury Quarry armor stone could be placed to minimize voids and increase surface contact (*id.* at TWC004087). A copy of the mockup presentation was provided to the government on March 3, 2016 (exs. G-8 to -9).

21. More than 60 Salisbury Quarry stones were delivered to, and stockpiled at, the contractor's staging area prior to appellant's submitting to the government information required by paragraph 2.1.4 of the specifications and prior to the

government's approval of stone from that quarry (ex. A-4 at TWC000456-457, ex. A-7 at 5; R4, tab 5.3 at 493-94).

22. By Serial Letter C-0001, dated March 7, 2016, the contracting officer responded to appellant's Serial Letter TWC-0001, rejecting the stones delivered to the site from Salisbury Quarry as not meeting specification requirements and being unacceptable for placement (R4, tab 5.3). The contracting officer stated that "[t]he specifications and contract documents presented in their entirety clearly indicate the intent of the Corps to have random, irregularly shaped stone that will provide the maximum potential for interlocking of various shaped stones" (*id*. at 493). The government made an "[e]ngineering determination that rectangular stones will not sufficiently interlock with the existing stones, as mandated by the specifications, and therefore will not provide the requisite stability over the functional life of this structure" (*id*. at 492). The contracting officer also stated that the "non-interlocking stones if placed on the existing structure would act as individual structures and not as a system of stones to resist wave and current forces that occur in the ocean environment as the design intended" (*id*.). The contracting officer relied upon paragraph 3.2.4 of the Contract, which requires "[t]he armor stones of various sizes and shapes . . . be distributed such that they form a compact mass and interlock with each other and the existing stones," stating "[b]ecause the existing stones in the jetty are of varying sizes and shapes, it is unlikely that a significant number of rectangular stones can be placed in a manner to be satisfactorily interlocked with the existing stones" (*id*.).

As to the issue of "blocky stone," the contracting officer stated that "the surface area contact of rectangular stones with relatively flat sides does not equate to the specifications' intent of interlocking, and does not provide sufficient stability during settling of the structure" (*id*. at 493). The contracting officer also stated:

> In your correspondence, you focus your justification on two words in the specification – "blocky" and "angular". However, that sentence must be read in the context of the surrounding sentences and the specification as a whole. Per specification section 32 05 00.38, paragraph 2.1.2, "...stone shall be furnished in blocky and angular shapes. Flat stones, tabular stones, slabs, boulders and parts of boulders will be rejected." The samples presented in your documentation are rectangular, and are considered to be unacceptable, as they share the seminal characteristic of several of the specified types of stones that will be rejected – flat surfaces. Stones that are flat, tabular and slabs, with

10

their flat sides, are not able to satisfy the interlocking requirement.

(*Id.*)

23. By Serial Letter TWC-0002, dated March 8, 2016, Mr. Potter responded to the contracting officer's letter, acknowledging the government's position that it "does not like the shape of the stone" and informing the government that it had ceased hauling materials from the Salisbury Quarry (R4, tab 5.4). Appellant requested a meeting "to inspect materials available at the quarry that are of more various shapes and not so rectangular" and stated it had "discovered on [the] ground at the quarry there are multiple various stone shapes we would like, as a team effort, to get approved" (*id.*).

24. The parties visited Salisbury Quarry on March 11, 2016. In a March 16, 2016, government "Memorandum For: Contracting," Shannon Geoly, Resident Engineer, documented the trip, stating, in part:

> 4. Mr. Leavitt proposed cutting the stone to shape it to meet the satisfaction of the Government. It was determined the sample available was not a final product. When questioned why the product was not finalized for review, he indicated he requested we visit the quarry to show us the color of the stone once it had weathered. It was noted the color of the stone was not an issue and that none of the documentation thus far had referenced the color of the stone but the shape of the stone.
>
> 5. Mr. Leavitt continued discussions regarding cutting the stone to alter the shape and stated multiple times that he, "was bending over backwards," offering this course of action because the Government had no choice but to approve this stone. I responded that was the opinion of Trade West Construction and not the Government.
>
> 6. Mr. Leavitt stated he wanted to know what the Government wanted. I responded that we already indicated our desired stone based upon the original stone that was submitted for acceptance and that had already been delivered to the storage area from Fountain Quarry . . . .
>
>         . . . .

11

7. During discussions, Mr. Leavitt repeatedly voiced his opinion the stone he was offering to use from Salisbury Quarry was a superior stone to that offered from Fountain Quarry. He maintained the stone was of better quality and would better interlock with the existing stone and with each other. He indicated that purchasing the stone from Salisbury Quarry would be 30-35% more expensive than purchasing from Fountain Quarry but that he could transport it to the storage yard much faster and mitigated concerns regarding obtaining stones of the proper tonnage.

. . . .

9. Mr. Leavitt spoke adamantly that he felt the Government had no choice but to accept the rectangular stone from the Salisbury Quarry because it fully met the project specifications. However, he offered to shape the rectangular stones to keep things moving forward. He stated that he would shape one of the already delivered stones and request the Government inspect the shaped stone upon completion at the Wilmington area storage yard. The Government agreed to inspect the proposed shaped stone upon completion but cautioned him that agreeing to inspect the stone did not guarantee approval of the process or the resultant shaped stone.

(Ex. G-10)

25. On March 11, 2016, following the site visit at the Salisbury Quarry, Mr. Leavitt emailed the contracting officer a copy of a letter authored by appellant's counsel, Karl Dix, Jr., stating his opinion that stone from Salisbury Quarry met the specification requirements (exs. G-11 to -12). Mr. Dix stated, in part:

Based upon the review of these submissions and our understanding of the nature and character of the stone proposed for use on the contract, we believe that the stone complies with the requirements of the specification both according to its plain terms as well as its intent. According to Corps of Engineers Board of Contract Appeals decisional law, rejection of specification compliant Armor

12

Stone entitles the contractor to recover its extra costs for complying with the additional Armor Stone requirements.

. . . .

Obviously, cut block stone is "blocky", much more so than stone which is quarried by blasting. It is angular in that the cut block stone has flat surfaces which converge to form angles rather than rounded surfaces which could be produced by blasting. The specification does not prohibit flat surfaces in the stone but does contain requirements relating to the proportion of dimensions to ensure that slabs, rather than blocks, are not used. The stone offered by Trade West, we understand, meets this dimensional requirement. We understand that cut block stone is generally not used for these applications since it is far more expensive than stone quarried by blasting. As the cut stone is safer (less susceptible to rolling or shifting), it will provide a much more stable armor for the jetty and better protect the jetty structure beneath it.

(Ex. G-12 at TWC008398, TWC008401) Mr. Dix also stated that the Contract did not define the term "interlocking" (ex. G-12 at TWC008399). Mr. Dix concluded that appellant was entitled "to its additional costs of performance" in the event the government did not accept the Salisbury Quarry stone (ex. G-12 at TWC008401).

26. Appellant submitted with its responsive motion a draft inspection report prepared by government Geologist Kelley Kaltenbach summarizing "the pertinent facts regarding the quarry inspection that took place on Friday, March 11, 2016 at the Rock of Ages, Salisbury Quarry" (ex. A-7 ¶ 1). Mr. Kaltenbach's report states, in part:

The quarry produces high grade granite dimension stone and cut block for high-end countertops. The stone proposed to supply the project is dimension stone that was rejected for high end commercial use. While the stone appears to be of high strength and quality, the smooth, saw cut faces are considered by USACE to be a cause for concern due to the possibility of stone slippage and movement within high energy coastal environment. The smooth-cut dimension stone was inspected at the quarry and found to be [sic] not to be acceptable for use on project, primarily due to the presence of the smooth cut face surfaces. The Contractor proffered to roughen the

13

faces by use of a hoe ram in order to utilize the stone at the quarry, primarily due to the quantities available to him USACE agreed to the demonstration, which was scheduled for the week of 14 MAR16.

(*Id.*)

27. By Serial Letter TWC-0003, dated March 20, 2016, and addressed to the USACE Wilmington District, Trade West stated that Fountain Quarry was depleted, and the rate of production could not provide the needed quantity of stones to successfully complete the Contract. Regarding the shaping of stone from Salisbury Quarry, Trade West stated:

> At this time we understand that the stone and source are still under review by the government and that the government would like the following concerns to be addressed. Of the samples that were provided on the morning of March 17, 2016 COE saw 3 that were close to the desired shapes. The main concerns with the best stones were related to the amount of smooth surfaces still present along the saw cut of each stone. The remaining unsatisfactory shaped stone samples had both excessive smooth surfaces and were still too blocky in form. Just over 1 hour after the conclusion of the onsite meeting four more pictures were provided of stone via email that are still on ground at the Salisbury Quarry. These were provided for COE comments and further analysis to ensure the next set of samples meet all the physical properties desired. These stones, while closer to the desired shape, still had qualities that were found to be blocky in form. One stone had two sides opposite one another that appeared mostly flat with one of the sides being of a smooth surface. We have taken all of these concerns into consideration and are working to develop an adequate sample to satisfy the governments [sic] directed requirements. Once we have developed a satisfactory shape we will keep the initially accepted samples on-site to be used as reference guides when inspecting new shaped stones that are delivered to the staging area. These reference stones will be left on ground until the end of the job and will be the last to be placed on the jetty structure.
>
> . . . .

The benefit of the Salisbury Quarry is the [sic] that the quantity already exists. We need only retrieve it from the near limitless stockpiles. Using the Salisbury stone provides a guarantee that the required amount can be harvested in time for an on-time completion. Shaping of the stone takes approximately 15-20 minutes per stone and we are capable of shaping and shipping upwards of 14 stones per day with a certain level of control to the weight of the stones. The quality of the stone is also greatly increased as there are little to no concerns with the fracturing that can occur during blasting.

(R4, tab 5.6 at 515-16)

28. By email to the contracting officer dated March 21, 2016, Mr. Leavitt provided a copy of appellant's March 20, 2016, letter referenced in SOF ¶ 27. Mr. Leavitt's email stated, in part:

The reason that I am shaping the rock coming from Salisbury to meet the direction of the USACE is that the current stockpile of rock meeting the COE requirements is over 4000 stones. I need approximately 350 to finish this project. It is my intention to produce a rock shape that the COE will approve and then shape each rock that will be hauled from Salisbury and use the Salisbury quarry for the balance of the needed rock to complete the Masonboro project.

(Ex. A-3)

29. Mr. Leavitt stated in his affidavit:

20. Trade West had strongly advocated for the use of the Salisbury Quarry rock without shaping as not only acceptable under the contract, but also a better product. The Corps refused to accept the stone by requiring Trade West to shape the rock. Since we had 475 stones left to place from the Salisbury Quarry rock, we were forced to perform as directed by the Corps. However, we repeatedly advocated to the Corps that the shaping of the rock was additional work. Even presuming that the shaping

15

operation would last 20 minutes per stone, that could equate to one month of extra work.

. . . .

22. Thereafter, on March 22, 2016, the Corps approved the large stone from the Salisbury Quarry to be used on the project provided that each individual stone was shaped consistent with the three examples that Trade West had shown the Corps of this stone that Trade West had mechanically shaped. This shaping made the stones jagged and less blocky and angular.

(Ex. A-1 at 6-7)

30. On March 22, 2016, the government issued a Quality Assurance Report (QAR) regarding approval of stone from the Salisbury Quarry, stating "[a]ll submittals now in and approved...stone to be shaped will follow 3 examples in the yard...ok to start work" (ex. G-13) (ellipses in original).

31. By email dated March 24, 2016, Mr. Potter contacted Jack Cox, an engineer and adjunct professor at the University of Wisconsin, concerning the interlock capability of Salisbury Quarry stone. Mr. Potter's email stated:

My name is Steven Potter and I am the Quality Control Manager for Trade West Construction. I am seeking information on the feasibility of stones interlocking along a jetty structure that is primarily comprised of jagged angular boulders weighing between 14 and 22 tons. The stones we are looking to place on top of this structure are of a blocky granite also weighing between 14 and 22 tons. The question in a nutshell is will blocky stones interlock with jagged boulders? It is our belief that the blocky stone will work, but I'd like to obtain your council [sic] and discuss whether or not the stone we want to use will work. You can reach me anytime at the number below here [or] at this email. I can provide you with pictures and any other information you may need. Please let me know if your services are available and if this is something you can help us with.

(Ex. G-25 at TWC005332-5333)

32. In an email also dated March 24, 2016, Mr. Cox responded:

> I will call you Monday to discuss, but that is a tough question. If you are placing the blocks on top of the existing armor of the jetty, I would say no, not a good idea. There will be a slip plane between them. You did not say how thick or how many layers you plan so I'm assuming this is placing a repair veneer over the old so likely just one layer. Likely you will not get much interlock. Square cubes of concrete have been used for armor, but they are still placed randomly at least two units thick, and care is taken so that they don't just stack on another giving a flat surface.
>
> I only know of one example where Bedford cut stone was used to cap some breakwaters. In that case they were more square log shaped so that the long axis spanned across the crest. It did seem to work but was so ugly that the owner ultimately rejected it[.]
>
> If you can send me a picture showing how blocky these are, maybe I can make a better call and get it approved for you. In the end, it will be how skilled your crane operator is that will matter, and that may require onsite inspection and control to assure a satisfactory product.

(Ex. G-25 at TWC005331-5332)

33. In an email from Mr. Potter to Mr. Leavitt, also dated March 24, 2016, Mr. Potter stated:

> Here is a response from one Engineer I reached out to. My email was short with little detail trying simply to open a dialogue. His response sounds great, but not in our favor. I'll put a packet of all we know together along with some photographs and see what he thinks.

(Ex. G-25 at TWC005331)

34. Although Mr. Potter indicated that he would provide Mr. Cox additional information regarding the interlock issue, Mr. Cox stated in an affidavit that he "did

17

not have any other email exchanges with Trade West until [he] was contacted by their counsel on July 17, 2019" (ex. A-6 at 2). Mr. Cox also stated:

> 6. My email did not advise Trade West that the "Salisbury Quarry stone would not provide better interlocking capability". What my email did state was that if the stone was installed as a veneer over the current stone, that the interlocking between the veneer and the current structure may not provide for proper interlocking. In my original email to Trade West, I was concerned about "slip planes" which could occur if two flat sides of a stone came in contact and then was infiltrated by liquid to cause the planes to slide in opposite directions. Some stone movement is acceptable if the slip or slide causes the stone to wedge itself into the slope to fill a void. A slip or slide of a stone is not favored if it causes the stone, and/or adjacent stones to fracture, slump or simply displace from its intended location, thus compromising the integrity of the slope. A veneer of stone could produce unfavorable sliding between the veneer and original structure.

> 7. I have since learned that each stone for this Project was individually selected and placed into the jetty to fill voids then existing in the jetty and to build the jetty to a specified elevation. The interlocking is achieved by the skillful placement of the stone in the jetty. Maximizing surface contact between the stones to nestle the majority of the stone weight between the other stones when filling the voids and, thereby reducing the size of the voids, would provide for better interlocking especially since the stone is quite heavy weighing 14 to 22 tons.

> 8. Interlocking of stone in a jetty and other coastal structures does not involve simply filling voids in the armor face with appropriately sized rocks. Interlocking is required and achieved by the use of heavy stone and placing it to fill voids in such a way so as to provide a compact, i.e. tightly bound and restrained mass or structure. Effective interlocking is not a characteristic of purely the stone geometry, but rather primarily a result of proper placement of angular and blocky stone (not rounded stone) such that multiple contacts between adjacent rocks is achieved. That is why "interlocking" is required under

18

the specification section (3.2.4) entitled "Armor Stone Placement" and not the section (2.1.2) generally titled "Armor Stone" which provides the characteristics of acceptable stone.

(Ex. A-6 at 2-3)

35. A total of 702 armor stones were placed at the project, 277 from Fountain Quarry and 425 from Salisbury Quarry stones (ex. G-14). Contract work was completed on or about April 29, 2016, and Trade West began to demobilize from the site on April 30, 2016 (R4, tab 2 at 31; ex. G-15).

36. The record contains a letter from appellant dated September 28, 2016, requesting an equitable adjustment based upon appellant's "belief that this direction was in direct conflict with the specifications and is subject to a change of conditions" (ex. A-4 at TWC000440). In its responsive brief, the government states, regarding that letter, "[t]here is nothing in the record showing the REA was submitted to USACE on that date. Regardless, this does not constitute a genuine issue of fact because it was still submitted several months after the project had been completed." (Gov't resp. at 3)

37. In October 2016, the government sent appellant the final modification to close out the Contract. On October 19, 2016, appellant indicated it would not sign the final modification, stating:

> Sorry it has taken me so long to reply to you I have been working at a remote site. On the final mod for the Masonboro project, I cannot sign and return the modification because it will close out the contract. During the course of performing the Masonboro project I was directed and required to shape some of the armor stones which I believe was not required by the specifications. As such I will be submitting a cost claim to recover the amounts required to complete the rock shaping as per USACE personnel direction. I will be contacting Charlene Figgins Contracting Officer shortly in regards to my claim.

(Ex. G-16)

38. By letter dated October 21, 2016, appellant submitted a certified claim to the contracting officer in the amount of $304,062, and requested a final decision (R4, tab 3).

19

39.  By letter dated November 29, 2016, the contracting officer requested appellant submit certified cost or pricing data (R4, tab 5.9 at 546).  Trade West responded by email dated December 23, 2016 (R4, tab 5.10).

40.  By letter dated January 20, 2017, the contracting officer issued a final decision denying appellant's claim.  The contracting officer's final decision did not raise lack of notice pursuant to the Changes clause as a defense to appellant's claim. (R4, tab 2; app. mot. at 11; gov't resp. at 7)

41.  Appellant filed a notice of appeal on February 21, 2017.

42.  The parties agree that the government' answer did not raise lack of notice as an affirmative defense (app. mot. at 11; gov't resp. at 7).

43.  On April 23, 2018, appellant submitted a revised claim to the contracting officer in the amount of $275,266.38 (ex. G-17).

DECISION

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Immunocept, LLC v. Fulbright & Jaworski LLP*, 504 F.3d 1281, 1286 (Fed. Cir. 2007) (citation omitted).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment."  *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  To defeat summary judgment, a responding party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The Parties' Areas of Agreement

The parties agree that their respective motions present questions of Contract interpretation (gov't mot. at 1; app. mot. at 2).  "When resolving a question of contract interpretation, our primary purpose is to ascertain the intention of the contracting parties."  *Southbridge Assocs., LLC*, ASBCA No. 54628, 05-1 BCA ¶ 32,855 at 162,799 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)).  "Under basic principles of the law, a contract is interpreted 'in terms of the parties' intent, as revealed by language and circumstance."  *Watts Constructors, LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37,563 at 182,385 (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) (citations omitted)).  Indeed, "the cardinal rule of contract construction [is] that the joint intent of the parties is dominant if it can be

ascertained." *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) (citing *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 119 (1907)).

It is significant here, that in their respective motions, neither party argues that the armor stone Contract specifications are ambiguous. Contract specification 2.1.2 required that armor stone "be furnished in blocky and angular shapes" (SOF ¶ 4). Specification 3.2.4 required that "armor stones of various sizes and shapes shall be distributed such that they form a compact mass and interlock with each other and the existing stones" (SOF ¶ 9). The parties agree that the Contract required "blocky and angular" stones, as well as stones of varying sizes and shapes (app. mot. at 4 (intent of the specifications was "to provide blocky and angular stones of various sizes and shapes"); gov't mot. at 1 ("scope of work included providing armor stone of varying sizes of blocky and angular shapes.")).[4] Reading the Contract as a whole, we agree that the Contract specifications, taken together, required "blocky and angular" stones, as well as stones of varying sizes and shapes.

Between a Rock and a Hard Place - the Parties' Divergent Views

The parties disagree whether Salisbury Quarry stone, without shaping, met the Contract specifications, including the "compact mass and interlock" requirement (*see* SOF ¶¶ 1, 8-9). Trade West argues that Salisbury Quarry stone, without shaping, was blocky and angular, as required by Contract specification 2.1.2, and was even "more blocky and angular than the previously approved stone" (app. mot. at 1). The government asserts that "[t]he Salisbury Quarry stone as initially presented failed to meet Contract requirements because all the stones furnished were the same shape - rectangular cubes of relatively uniform size" (gov't mot. at 9). The government argues that "whether the rectangular stone block from the Salisbury Quarry met the definition of 'blocky and angular shapes' is not dispositive," because "in addition to being 'blocky and angular shapes,' the armor stone was to be 'of various sizes and shapes . . . distributed such that they form a compact mass and interlock with each other and the existing stone'" (gov't resp. at 8).

Appellant denies the government's contention, stating "the proposed Salisbury Quarry blocky and angular blocks of stone interlock better than the Fountain Quarry jagged stone produced by blasting" (app. mot. at 4). Appellant admits that "[t]he specifications required the Armor Stones to also consist of various shapes and sizes." Appellant alleges it met this requirement, however, arguing that "[v]arious shapes and sizes were provided since the [Salisbury Quarry stone] blocks had different rectangular

---

[4] The government notes that, as recognized in appellant's own documents, "Fountain Stone, in addition to being blocky and angular shapes, was also provided in various sizes and shapes" (gov't resp. at 10 (citing ex. A-1 at 50-73; R4, tab 5.2)).

dimensions." (App. mot. at 12) In its reply brief, appellant states that "[t]he quarry stone proposed by Trade West was not 'uniformly shaped' and the size difference was not relatively minor." As support, appellant provides the dimensions and weight of several Salisbury Quarry stone, noting that "[s]ince the angles are different for each blocky stone (and for many of planes on the blocky stone), the shapes are not uniform." (App. reply at 3, discussing ex. A-1 at TWC000629)

Although the government is entitled to strict compliance with the specifications, "rejection of a contractually permissible method of performance can constitute a constructive change to the contract and entitle appellant to an equitable adjustment." *W.M. Schlosser Co., Inc*., ASBCA No. 44778, 96-2 BCA ¶ 28,297 at 141,288. Resolution of the issue presented is not amenable to summary judgment as both parties have proffered conflicting evidence concerning the "compact mass and interlock" requirement, specifically whether Salisbury Quarry stones, without shaping, would have met the requirement that they be distributed such that they formed a compact mass and interlock with other stones and existing stones (SOF ¶¶ 20-22, 24, 34). A material issue of fact exists also as to whether the Salisbury Quarry stone met the requirement that stones be of varying sizes and shapes (SOF ¶¶ 20-22).

For example, the government characterizes appellant's argument as being "intended to demonstrate that as a factual matter the Salisbury Quarry provides for better interlocking, based on that particular stone's qualities. What Trade West does not do, is even attempt to demonstrate how that stone met the contractual requirement to interlock via the use of stones of varying sizes and shapes to form a compact mass." (Gov't resp. at 10) The record reflects, however, that appellant provided documentation, including a mockup of the Salisbury Quarry stone, purportedly addressing the interlocking capability of that stone (SOF ¶ 20). Determining the sufficiency of this evidence as to the interlocking capability of Salisbury Quarry stone likewise requires the Board make factual findings it is unable to make in the context of summary judgment.

Also, according to the government, Salisbury Quarry stone was noncompliant based upon an "[e]ngineering determination that the rectangular shaped stones would 'not sufficiently interlock with the existing stones, as mandated by the specifications, and therefore [would] not provide the requisite stability over the functional life of the structure'" (gov't mot. at 4 (Statement of Undisputed Material Facts No. 6) (bracketed word in original)). Whether this determination was correct is an issue of fact which requires the Board to make findings assessing the correctness of that determination.[5]

---

[5] The parties likewise disagree about the import of statements made by an engineer in a March 2016 email about the interlocking capability of the Salisbury Quarry stone (SOF ¶¶ 31-32). Appellant included with its response an affidavit from

22

Simply stated, appellant alleges that the stones met the compact mass and interlock requirements, and the government alleges the stones did not. Resolution of that issue is not possible at this point in the proceedings as it presents a triable issue. *Alderman Building Co., Inc.*, ASBCA No. 58082, 15-1 BCA ¶ 35,841 at 175,272 (on summary judgment, "[o]ur task is not to resolve factual disputes, but to ascertain whether material disputes of fact-triable issues-are present." (quoting *Conner Bros. Construction Co.*, ASBCA No. 54109, 04-2 BCA ¶ 32,784 at 162,143, *aff'd, Conner Bros. Construction Co. v. Geren*, 550 F.3d 1368 (Fed. Cir. 2008))). It does not matter that the parties have cross-moved for summary judgment, both claiming that there exists no material issue of fact. *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 ("[e]ach cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other'" (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

The Parties Pre-Dispute Contract Interpretation

The government argues that "Trade West's initial choice of armor stone demonstrates that it understood the correct interpretation of the contract requirement" (gov't mot. at 9), and that "[b]oth parties interpreting the contract consistently prior to a dispute is entitled to 'great, if not controlling, weight'" (gov't resp. at 10 (quoting *Ver-Val Enters.*, ASBCA No. 43766, 95-1 BCA ¶ 27,334 at 136,232)). As a general matter, although "extrinsic evidence may not be used to interpret an unambiguous contract provision," tribunals "have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning." *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc) (examining contemporaneous evidence of parties' understanding to determine whether it was consistent with contract's plain meaning)).

It is undisputed that soon after award, pursuant to Contract specification 2.1.4, appellant selected and identified to the government the source from which "the Contractor proposes to obtain stone materials as required for these specifications" (SOF ¶ 6), and the government accepted Fountain Quarry stone, as selected and identified by appellant (SOF ¶ 16). "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." *Optic-Elec. Corp.*, ASBCA No. 24962, 83-2 BCA ¶ 16,677 at 83,004 (citation omitted), *amended on reconsid.*, 84-3 BCA ¶ 17,565. "The parties' contemporaneous construction of an agreement, before it has become the subject of

_____

the engineer explaining his March 2016 email and the alleged ability of various armor stone to interlock (SOF ¶ 34).

23

dispute, is of course entitled to great weight in its interpretation." *Ariz. Dep't of Trans. v. United States*, 216 Ct. Cl. 221, 236, 575 F.2d 855, 863 (1978).

Appellant argues that its "prior performance did not demonstrate 'the same interpretation and understanding of the contract', but rather reflected that various shapes and sizes of stone, to include both the Fountain Quarry stone and the Salisbury Quarry stone, were acceptable under the contract" (app. mot. at 4 (citing ex. A-1 at 6 (Leavitt aff. ¶¶ 19-20))).[6] Notwithstanding appellant's contrary assertion, its "prior performance" did not reflect its belief or demonstrate whether Salisbury Quarry stone was "acceptable under the contract." Rather, Trade West's prior performance reflected its belief (and confirmation) that Fountain Quarry stone met Contract requirements.

It also is undisputed that Fountain Quarry and Salisbury Quarry produced different types of armor stone. Appellant admits that Salisbury Quarry stones "were rectangular blocks" (app. mot. at 15) and "were more blocky and angular than the previously approved stone" (app. mot. at 1).[7] According to appellant, this difference in shape largely was a function of the manner in which the stones were quarried, i.e., a more jagged stone is obtained through blasting, while a more smoothed-edged stone is obtained through cutting (SOF ¶ 25; *see also* app. mot. at 7 n.2). As stated by appellant, "[t]he initial Fountain Quarry had used a different extraction method for the stone resulting in stone acceptable to the Corps, but which while blocky and angular, was not as blocky and angular as the stone rejected by the Corps" (app. mot. at 4).[8]

According to the government, "Fountain Quarry stone was produced in varying sizes and shapes with angular surface features, and closely resembled the stone in the existing jetty structure" (gov't mot. at 10). After a site visit to inspect Salisbury Quarry, a government geologist noted that Salisbury Quarry:

---

[6] Appellant states that "the Fountain stone complied with the contract requirements as approved by the Government while the Salisbury stone blocks was likewise compliant with the specification in a superior product" (app. mot. at 15 (citing Proposed Findings of Fact Nos. 23-24 and ex. A-1 at 4 (Leavitt aff. ¶ 13))).

[7] Appellant included with its motion its March 1, 2016, "Mockup of Jetty Conditions," which demonstrates, in stark contrast, the difference in shape between the "jagged" stone extracted from Fountain Quarry and the "more blocky and angular" stone offered by appellant from Salisbury Quarry (*compare* ex. A-1 at TWC000606-608, *with* TWC000613-614).

[8] Appellant likewise admits that "cut block stone is generally not used for these applications since it is far more expensive than stone quarried by blasting" (SOF ¶ 25).

24

> [P]roduces high grade granite dimension stone and cut block for high-end countertops. The stone proposed to supply the project is dimension stone that was rejected for high end commercial use. While the stone appears to be of high strength and quality, the smooth, saw cut faces are considered by USACE to be a cause for concern due to the possibility of stone slippage and movement within high energy coastal environment.

(SOF ¶ 26)

That appellant recognized the difference between the stone it supplied from Fountain Quarry and the stone it proposed to supply from Salisbury Quarry, is evident in Mr. Potter's inquiry to Mr. Cox, stating "[t]he question in a nutshell is will blocky stones interlock with jagged boulders" (SOF ¶ 31). One reason this is important is the Contract required Trade West to place a single layer of armor stone that interlocked with the existing stones, which Mr. Potter recognized were "primarily comprised of jagged angular boulders." (SOF ¶¶ 9, 11-12, 31)[9]

Although this pre-dispute extrinsic evidence of the parties' intent and contract interpretation ultimately may be entitled to "great weight," the factual dispute regarding whether Salisbury Quarry stone met the contract requirements first must be addressed. The difference between the two types of stone, as noted above, is one factor to consider in determining whether the Salisbury Quarry stone met the contract requirements. However, the parties' cross-motions for summary judgment do not provide a proper vehicle by which to resolve that dispute.

Government Alleged Direction to Shape Salisbury Quarry Stone

According to appellant, "[t]he issue in this appeal is whether the Corps' requirement for Trade West to mechanically reshape stone blocks was a change to the contract" (app. mot. at 12). Appellant argues that the government "directed Trade West to hammer and fracture the stone so that they were less 'blocky' and 'angular'" (app. mot. at 1-2). The government argues that it "never directed the contractor to shape the Salisbury Quarry stone. Instead, USACE allowed Trade West to perform the shaping effort in order to use that particular source of stone." (Gov't mot. at 10)

---

[9] Mr. Potter noted the difference between the two types of stone, stating "I am seeking information on the feasibility of stones interlocking along a jetty structure that is primarily comprised of jagged angular boulders weighing between 14 and 22 tons. The stones we are looking to place on top of this structure are of a blocky granite also weighing between 14 and 22 tons." (SOF ¶ 31)

It is well established that "[t]o recover under a constructive change theory, a contractor has the burden of showing that the work performed was not 'volunteered,' but was performed pursuant to Government direction." *S-TRON*, ASBCA Nos. 45893, 46466, 96- 2 BCA ¶ 28,319 at 141,397 (citing *Len Co. and Assocs. v. United States*, 181 Ct. Cl. 29, 38 , 385 F.2d 438, 443 (1967)). "In the absence of a direction by the Government, there can be no reliance by appellant even though it incurred increased costs." *Dan G. Trawik III*, ASBCA No. 36260, 90-3 BCA ¶ 23,222 at 116,541.

The arguments as stated by the parties suggest the existence of a disputed factual dispute, i.e., whether the government directed appellant to shape Salisbury Quarry stone. As discussed above, in considering the parties' summary judgment motions, our function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Here, we must consider whether there is any genuine issue for trial, i.e., has appellant proffered specific evidence of any direction by the government requiring appellant to shape Salisbury Quarry stone. *The Boeing Co.*, ASBCA No. 54853, 12-1 BCA ¶ 35,054 at 172,196 ("[o]ur task is not to resolve factual disputes, but to ascertain whether material disputes of fact–triable issues–are present" (citations omitted)).

The nature of the government's alleged direction is, in the words of appellant, that "the Corps would only approve the Salisbury stone blocks if the blocks were shaped as approved by the Corps" (app. mot. at 10). Although this does not equate to an affirmative direction by the government to shape the stone, and perhaps is more properly cast as a decision by appellant to shape the stone to meet the government's concerns, it raises the factual issue whether the government's rejection of the Salisbury Quarry stone implicitly required some change on the part of the contractor.

As support for its argument that it was directed to shape the stone, appellant cites Mr. Leavitt's email dated March 21, 2016, to the contracting officer which states, in part, "[t]he reason that I am shaping the rock coming from Salisbury to meet the direction of the USACE is that the current stockpile of rock meeting the COE requirements is over 4000 stones" (app. mot. at 9 (citing ex. A-3); SOF ¶ 28).[10] The factual issue requiring resolution also is evident in the parties' discussion of appellant's Statement of Additional Undisputed Material Facts (Undisputed Material Facts) No. 27, which states: "The Corps directed Trade West as the Corps would only approve the Salisbury stone blocks if the blocks were shaped as approved by the Corps" (app. mot. at 10 (citing ex. A-1 at 7 (Leavitt aff. ¶ 22))). In response to Undisputed Material Facts No. 27, the government "admits that it would only approve the Salisbury Quarry stone if it was shaped to meet the specification requirements, but

---

[10] Mr. Leavitt's email identifies neither a specific, affirmative direction from the government to shape the stone, nor the government employee who allegedly directed appellant to shape the stone.

further states it did not direct Trade West to shape the Salisbury Quarry stone and that other potential sources were available" (gov't resp. at 6). Appellant replies to the government's response, stating that "Trade West proposed stone that was compliant with the specifications and was required to reshape it to cause its acceptance by the Corps which constituted a change to the Contract. Trade West is claiming its increased costs to perform work not required by the specifications." (App. reply at 7)

As we noted recently, "[a] constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, due either to an express or implied informal order from an authorized government official or to government fault." *Optimization Consulting, Inc.*, ASBCA No. 58752, 19-1 BCA ¶ 37,426 at 181,905 (quoting *Parwan Group Co.*, ASBCA No. 60657, 18-1 BCA ¶ 37,082 at 180,498). Although the record suggests that the contractor volunteered to shape the stone in the first instance (SOF ¶ 24), to resolve the issue ultimately we must determine whether the government's refusal to accept Salisbury Quarry stone without shaping amounted to an informal order to shape the stone. As noted above, the contracting officer was well aware of the contractor's efforts to shape the stone (SOF ¶¶ 27-28).

The government notes that quarries other than Salisbury Quarry were available, stating "Trade West received multiple expressions of interest and quotations both prior to receiving [the] Notice to Proceed and after when it became clear the Fountain Quarry could not meet production requirements" (gov't resp. at 4 (citing ex. G-18 to -24)). Whether these quarries had stone that met Contract requirements, and were a viable alternative, is an issue of fact that likewise cannot be resolved here.

Appellant argues that:

> As the government agency in charge of the Project, it could
> have suspended Trade West's performance and directed
> Trade West to identify a preferable alternative to the
> Fountain Quarry armor stone or analyzed other, perhaps
> more cost efficient options to complete the Project.
> Instead, the Corps did none of these things.

(App. reply. at 13) However, appellant, not the government, was responsible for performing the work on this project (SOF ¶ 3). Appellant was responsible for identifying the stone source and the government was responsible for approving appellant's source, based upon testing of the stone sampled by appellant (SOF ¶ 6). The Contract did not provide the government the right to direct appellant to use a specific stone source or quarry.

27

Government Notice of Contractor's Claim

The government seeks denial of this appeal based upon appellant's alleged lack of notice pursuant to the Changes clause, stating, "when a directive by the government may be construed as a change order, the contractor must give written notice to the contracting officer within 20 days after any costs are incurred as a result of the change, and the contractor must request an equitable adjustment within 30 days of the submission of written notice" (gov't mot. at 10 (citing FAR 52.253-4 (2007) and *AAB Joint Venture v. United States*, 75 Fed. Cl. 414, 423-424 (Fed. Cl. 2007))).

The government argues that "[a]t the time shaping was being discussed, Trade West did not indicate verbally or in writing that it considered the shaping effort to be a change or that it intended to seek monetary damages for the shaping effort" (gov't mot. at 10-11). In response, appellant does not allege that it specifically notified the government that it considered reshaping the Salisbury Quarry stone to be a Contract change (app. mot. at 16-17; app. reply at 10). Instead, appellant argues that it complied with the notice requirements, citing to documents wherein appellant informed the government of its "interpretation of the specification to permit use of the Salisbury Quarry blocks of stone . . . ." (app. mot. at 16 (citing ex. A-4 at TWC000441-53)). Although the letter cited by appellant as support does discuss appellant's Contract interpretation, it does not mention shaping Salisbury Quarry stone.

Appellant likewise cites to an "opinion letter" wherein appellant's counsel allegedly "asserted that the refusal to accept the blocks of stone was a change to the contract for which the contractor would be entitled to compensation" (app. mot. at 16 (citing ex. A-4 at TWC000459-63)). Contrary to appellant's assertion, the "opinion letter" does not state that the government's "refusal to accept the blocks of stone was a change to the contract." Rather, the letter states "we believe that the stone complies with the requirements of the specification both according to its plain terms as well as its intent. According to Corps of Engineers Board of Contract Appeals decisional law, rejection of specification compliant Armor Stone entitles the contractor to recover its extra costs for complying with the additional Armor Stone requirements." (SOF ¶ 25) The opinion letter does not detail appellant's "extra costs" or mention shaping Salisbury Quarry stone.[11]

---

[11] Appellant also cites the affidavit of Mr. Leavitt, who states that he offered to waive the costs of shaping Salisbury Quarry stone if the government would accept, without shaping, Salisbury Quarry stone already delivered to the project site (app. mot. at 17 (citing ex. A-1 at 7-8)). The government denies this allegation, stating instead that appellant "assumed the risk of delivering the Salisbury Quarry stone prior to USACE approval" (gov't resp. at 6-7).

28

In its reply brief, appellant argues that "to satisfy the contract's notice requirement, Trade West need only have 'reasonably manifest[ed] its intention to seek recovery of money based on a claim of legal right under the contract'" (app. reply. at 9 (quoting *Gulf & Western Indus., Inc. v. United States*, 6 Cl. Ct. 742, 750 (1984))). Appellant likewise argues that the government had constructive notice of its claim, stating "[a] contractor's failure to provide the government with notice of a potential claim arising out of additional work does not bar to the contractor's claim where (1) the government was 'aware of the operative facts' underlying the claim such that (2) the failure to provide notice did not prejudice the government" (app. reply at 11 (citing *Dan Rice Constr. Co., Inc.*, ASBCA No. 52160, 04-1 BCA ¶ 32,595 at 161,263)).

The government argues that "Trade West only raised the issue of a potential claim six months after the project was completed" (gov't mot. at 11). The Contract was completed at the end of April 2016 (SOF ¶ 35). By letter dated September 28, 2016, appellant requested an equitable adjustment for shaping the Salisbury Quarry stone (SOF ¶ 36). By email dated October 19, 2016, appellant informed the government that it would not sign the modification closing out the Contract because it was "directed and required to shape some of the armor stones" and would "be submitting a cost claim to recover the amounts required to complete the rock shaping as per USACE personnel direction" (SOF ¶ 37). On October 21, 2016, appellant submitted to the contracting officer a certified claim in the amount of $304,062, and requested a final decision (SOF ¶ 38).

On the issue of whether the government was on constructive notice of appellant's potential claim, it is undisputed that during a meeting between the parties on March 11, 2106, appellant notified the government of its intent to shape Salisbury Quarry stone (SOF ¶¶ 24, 26). That same day, appellant emailed to the government Mr. Dix's letter stating that Trade West was entitled "to recover its extra costs for complying with the additional Armor Stone requirements" (SOF ¶ 25). It likewise is undisputed that, by letter to the government dated March 20, 2016, and email dated March 21, 2016, appellant notified the contracting officer of its plan to shape Salisbury Quarry stone, and stated the amount of time it would take to shape each stone (approximately 15-20 minutes per stone) and the number of stones the contractor could shape and ship per day (14 stones) (SOF ¶¶ 27-28). The government's March 22, 2016, QAR, confirms the government's understanding that appellant would shape the Salisbury Quarry stone, and approved appellant "to start work" (SOF ¶ 30).

The record establishes that the government was on notice of the facts underlying appellant's claim in March 2016. The contracting officer was aware of the contractor's decision to shape Salisbury Quarry stone, as well as appellant's labor estimate per stone, per day, for that shaping work (SOF ¶¶ 27-28). The government's burden "to establish that it was prejudiced by the absence of the required notice . . . cannot be satisfied simply by allegation, but must be supported by evidence in the

record." *Grumman Aerospace Corp.*, ASBCA Nos. 48006 *et al.*, 03-1 BCA ¶ 32,203 at 159,185.

The government notes that "[t]he purpose of the notice provision is to enable the Government to collect data on increased costs of having a contractor continue performing an activity it considers a change to the contract to determine whether to allow the activity to continue" (gov't resp. at 11 (also citing *Dan Rice Constr.*, 04-1 BCA ¶ 32,595)). The government claims that because of the alleged lack of notice, it "was precluded from evaluating the additional cost associated with that effort, track[ing] any additional time or effort to perform the shaping, or issue[ing] an upfront modification to cover those costs" (gov't resp. at 11). Other than argument of counsel, the government offers no record evidence in support of its claim of prejudice.

The government notes also that this "Board has found prejudice to the Government in situation[s] where the passage of time between the alleged change and notice of the [change] results in the loss of project documentation, made locating project personnel more difficult or resulted in less memory of the project" (gov't resp. at 11 (citing *Hunt Building Corp.*, ASBCA No. 31775, 89-1 BCA ¶ 21,196 at 106,969-70)). However, the government does not offer any evidence that this passage of time prejudiced it here.

Furthermore, it is undisputed that the contracting officer did not raise in the final decision lack of notice under the Changes clause as a basis for denying appellant's claim (SOF ¶ 40). *Harper Dev. & Assocs.*, ASBCA No. 34719, 90-1 BCA ¶ 22,534 at 113,085 (declining to bar claim on technical ground of lack of written notice where "the contracting officer's final decision under the Disputes clause considered the claim on its merits and did not raise the lack of written notice issue."). It likewise is undisputed that the government did not plead lack of notice as an affirmative defense (SOF ¶ 42). *Michael, Inc.,* ASBCA No. 35653, 92-1 BCA ¶ 24,412 at 121,863 (government waived affirmative defense of lack of notice by not raising it until post-hearing brief); *Northrop Worldwide Aircraft Servs., Inc.,* ASBCA Nos. 45216, 45877, 96-2 BCA ¶ 28,574 at 142,630-31 (failure to timely raise affirmative defense may waive it); *see* Board Rule 6(b) (requiring government to include in its answer any affirmative defense). Even assuming appellant failed to provide the requisite Changes clause notice, the government waived any objection it may have had to appellant's claim based upon that lack of notice.

<u>CONCLUSION</u>

The parties' cross-motions for summary judgment are denied. The parties are ordered to confer and file a joint report with the Board setting forth the status of this appeal, including further proceedings, within 30 days of their receipt of this decision.

Dated: October 8, 2020

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61068, Appeal of Trade West Construction, Inc., rendered in conformance with the Board's Charter.

Dated: October 13, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

31